# EXHIBIT A

```
                                                                    1

 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                        SOUTHERN DIVISION

 3


 4    WILLIAM DAVID SEAL,
            Plaintiff,
 5


 6    VERSUS            CIVIL ACTION NO: 1:08cv175LG-RHW

 7

      HARRISON COUNTY, MISSISSIPPI,
 8    by and through its Board of
      Supervisors; HARRISON COUNTY
 9    SHERIFF, George Payne, in his
      official capacity; CORRECTIONS
10    OFFICER THOMAS PRESTON WILLS,
      acting under color of state
11    law; CORRECTIONS OFFICER RYAN
      TEEL, acting under color of
12    state law; CORRECTIONS OFFICER
      MORGAN THOMPSON, acting under
13    color of state law,
            Defendants.
14

15    _____

16          DEPOSITION OF WILLIAM DAVID SEAL

17    _____

18          Taken at the offices of Brown Buchanan,
      P.A., 796 Vieux Marche' Mall, Suite 1,
19    Biloxi, Mississippi, on Thursday,
      August 20, 2009, beginning at 9:30 p.m.
20

21

      APPEARANCES:
22
          PATRICK R. BUCHANAN, ESQUIRE
23        Brown Buchanan, P.A.
          796 Vieux Marche' Mall, Suite 1
24        Biloxi, Mississippi  39530
            ATTORNEY FOR PLAINTIFF
25
```

```
 1   APPEARANCES:  (Continued)

 2        JOE C. GEWIN, ESQUIRE
          HALEY BROOM, ESQUIRE
 3        Dukes, Dukes, Keating & Faneca, P.A.
          2909 13th Street, Sixth Floor
 4        Gulfport, Mississippi  39501
              ATTORNEYS FOR GEORGE PAYNE, JR.
 5
          KAREN J. YOUNG, ESQUIRE
 6        Meadows Law Firm
          1902 21st Avenue
 7        Gulfport, Mississippi  39501
              ATTORNEY FOR HARRISON COUNTY,
 8        MISSISSIPPI

 9        IAN A. BRENDEL, ESQUIRE
          Law Offices of Jim Davis
10        1904 24th Avenue
          Gulfport, Mississippi  39501
11            ATTORNEY FOR THOMAS PRESTON WILLS,
          RYAN TEEL, and MORGAN THOMPSON
12

13   REPORTED BY:

14
                 Lori R. Migues, CSR No. 1245
15                Simpson Burdine & Migues
                   Post Office Box 4134
16                Biloxi, Mississippi  39535
                  LMigues@SBMreporting.com
17                    228-388-3130

18

19

20

21

22

23

24

25
```

```
 1   no.
 2         Q.   Okay.  Well, when did you start
 3   drinking?
 4         A.   Sometime in the evening.
 5         Q.   Okay.  What were you drinking?
 6         A.   Beer.
 7         Q.   How much do you think you drank that
 8   day?
 9         A.   A six-pack maybe.
10         Q.   That's all you drank was a six-pack of
11   beer?
12         A.   Yes, ma'am.
13         Q.   Okay.  Because I remember in your
14   medical records it stated you didn't recall
15   everything that happened.  Now, was that because
16   you were drunk?
17         A.   No.
18         Q.   All right.  You just didn't remember --
19         A.   Because my head was slammed into the
20   pavement by the booking officers.  It's hard to
21   remember after that.
22         Q.   Okay.  Slammed into the pavement by the
23   booking officers.
24              Now, do you think the same people that
25   arrested you are the same people that booked you
```

1  don't know where they went. I've never seen them
2  since, nor prior to that.
3       Q.  Okay. Now, they were accusing two of
4  your sons for looting their home or another home?
5       A.  The house right next door. It was not
6  their home.
7       Q.  Did y'all get into an argument?
8       A.  Yeah.
9       Q.  Okay. And what was said during that?
10      A.  I told them my sons were not even here,
11 so it would be impossible for them to loot
12 anyplace if they were not physically here and that
13 they should get off of my property.
14      Q.  And what did they say, okay, see you
15 later, or did y'all get into a little argument
16 there?
17      A.  They said, well, we understand that they
18 did loot your home -- loot the home next door.
19 And I said, I think you better get the hell off of
20 my property.
21      Q.  And were they saying that they looted it
22 that night or a previous night?
23      A.  They didn't say.
24      Q.  Were your two sons ever home a couple --
25 since Katrina to this date of arrest, that time

1   Q.   Did y'all hang out much, socialize?

2   A.   No. They're a lot younger.

3   Q.   Okay. Now, after these women drove off,
4   you started calling the Gulfport Police
5   Department, didn't you?

6   A.   (Nodding head affirmatively.)

7   MR. BRENDEL:

8       Answer out loud. You have to answer out
9   loud.

10  THE WITNESS:

11      Yes, yes, yes. Thank you.

12  MS. BROOM:

13  Q.   You started calling the Gulfport Police
14  Department, and you used extreme profanity, didn't
15  you?

16  A.   Yes.

17  Q.   And for the record, I hate to say it,
18  but motherfucker, asshole, God damn, you said all
19  of that, didn't you?

20  A.   Probably.

21  Q.   Now, why were you cussing the
22  dispatcher?

23  A.   Because they were blowing me off, saying
24  I could do something tomorrow, come fill out a
25  complaint.

```
 1   stating that you were very hostile and sarcastic?
 2   Do you agree with that?
 3        A.   Yes.
 4        Q.   You agree that you were very hostile and
 5   sarcastic with the dispatcher?
 6        A.   Yes.
 7        Q.   Now, they hung up on you.  And you
 8   called back, correct?
 9        A.   Yes.
10        Q.   Did you start talking again to the same
11   person?
12        A.   Yes.  And she had a captain, I believe,
13   or somebody, lieutenant, somebody --
14        Q.   And what was said during that second
15   call?
16        A.   Essentially the same things, and he hung
17   up.
18        Q.   Okay.  Did you call back?
19        A.   No.  I remember two calls.
20        Q.   Did you eventually hang up on them?  Did
21   you terminate the last call?
22        A.   That's possible.  I couldn't --
23        Q.   Did they tell you that the units were on
24   the way to handle the problem?
25        A.   Uh-huh.  Yes, ma'am.
```

```
 1         Q.    Off your car.
 2         A.    I remember getting off of my car when
 3   they drove up.
 4         Q.    You don't recall them asking you to get
 5   off the car and you responding, fuck you guys?
 6         A.    No.
 7         Q.    And then running into your -- or
 8   attempting to run into your house?
 9         A.    No.
10         Q.    Okay.  Now, you were resistant with
11   them, weren't you?
12         A.    I don't think when a cop comes up to me
13   and says, I am -- pardon my language, says I'm
14   sick of this shit and snatches me by my shirt and
15   the other ones jump on me, I feel I can do
16   whatever I need to to protect my being.
17         Q.    All right.  And I understand that.  I
18   just want to know about what happened there
19   because it looks like there was a big scuffle and
20   a lot went down there when the Gulfport Police
21   Department arrived.
22         A.    The same cop had been to my house in the
23   past.  My wife has schizoaffective disorder.  In
24   the past, I can't tell you when, she was pretty
25   psychotic.  She had a knife.  I called the
```

```
 1   you and want to take you down; did you understand
 2   that?
 3        A.   No.
 4        Q.   Okay.  You were kind of confused,
 5   weren't you, about what was going on?
 6        A.   Yeah.
 7        Q.   Now, they eventually took you and threw
 8   you to the ground, didn't they?
 9        A.   I thought it was to the ground.  It was
10   -to the trunk of my car.
11        Q.   To the trunk of your car?
12        A.   Because my neighbor was outside then,
13   Crystal Gomez.
14        Q.   Now --
15        A.   I did not see her.
16        Q.   Right.  And I realize you thought, at
17   one time, it was to the pavement, correct?
18        A.   Yes.
19        Q.   Now, if you would have told the doctors
20   it was to the pavement, you were actually taken to
21   the ground, weren't you?
22        A.   I thought so.  She said it was to the
23   back of the truck -- the trunk.
24        Q.   Well, I'm not asking you what she said
25   or thinks.  I'm asking you what you remember and
```

```
 1   MS. BROOM:
 2        Q.   On the second page --
 3   MR. BUCHANAN:
 4           Are we going to attach this, since we
 5   talked about it?
 6   MS. BROOM:
 7           Yeah.  I'll attach, as Exhibit 1, the
 8   Uniform Arrest Report.
 9                (Exhibit 1 was marked.)
10   MS. BROOM:
11        Q.   And I'm referring to the second page
12   right here, if you'll read that, and preferably
13   just the first line.  Doesn't it say, Altercation
14   with police officer and face hit pavement.  He has
15   been drunk since -- drinking since 9/4/05, 4:00 to
16   5:00 p.m., does not remember much about event.
17   And that's all I'm going to ask you about right
18   now.
19        A.   Okay.  Well --
20        Q.   Did you tell the ER doctor this, that
21   you were -- that your face hit the pavement?
22        A.   Ma'am, to be honest with you, I was in
23   handcuffs, taken from the jail after the jailers
24   had beaten me.  I was with one cop, he and I.
25   Between the jail, Gulfport Memorial, Gulfport
```

```
 1        Q.    -- took you down?
 2        A.    Right.  But I know after the booking
 3   officer slammed me into the pavement, I know there
 4   was blood going down in front of my eye.  So, now,
 5   did a laceration occur to my left eye from the
 6   Gulfport police that was exacerbated by the
 7   booking officers, I can't say.
 8        Q.    But my question is:  Isn't it true that
 9   a laceration did occur from the Gulfport Police
10   Department?
11        A.    Correct.  As to location, I'm not sure.
12        Q.    Okay.  But it could --
13        A.    Because there was one here and up here.
14        Q.    Correct.  But the one on your left
15   eyebrow, it could have occurred from the Gulfport
16   Police Department, couldn't it?
17        A.    Could have.
18        Q.    And it did, in fact, occur because of
19   the Gulfport Police Department, didn't it,
20   according to your statements to Memorial Hospital?
21        A.    I don't know where that laceration came
22   from at the time.  If I was in cuffs, how would I
23   know?
24        Q.    Well, you're suing the Harrison County
25   jail, aren't you, and alleging that they caused
```