1

```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                     SOUTHERN DIVISION



GARY BRICE McBAY,
     Plaintiff,


VERSUS              CIVIL ACTION NO: 1:07cv1205LG-RHW


HARRISON COUNTY, MISSISSIPPI,
by and through its Board of
Supervisors; HARRISON COUNTY
SHERIFF, George Payne, in his
official capacity; CORRECTIONS
OFFICER MORGAN THOMPSON,
acting under color of state law,
     Defendants.
```

---

### 30(b)(6) DEPOSITION OF HARRISON COUNTY SHERIFF'S DEPARTMENT, GIBRAN WERBY, DESIGNEE

---

    Taken at the offices of Dukes, Dukes,
    Keating & Faneca, P.A., 2909 13th
    Street, Sixth Floor, Gulfport,
    Mississippi, on Friday, October 2, 2009,
    beginning at 9:07 a.m.


**APPEARANCES:**

    MARK V. WATTS, ESQUIRE
    Brown Buchanan, P.A.
    796 Vieux Marche' Mall, Suite 1
    Biloxi, Mississippi  39530
        ATTORNEY FOR PLAINTIFF

**EXHIBIT A**

1  MS. BROOM:
2       That's fine.
3  MR. WATTS:
4       Q.   So were you with Harrison County after
5  the storm for just a month or was it a few months
6  after?
7       A.   Oh, no.  It was a just -- it was a very
8  short period of time.  Until the FBI came back up,
9  then I went back with them.
10      Q.   Okay.  And so when you were there, you
11 had occasion to work on an incident with an
12 arrestee named William David Seal?
13      A.   I did.
14      Q.   And how did you get that assignment?
15      A.   As it normally was done through the
16 sheriff who directed Steve Campbell who directed
17 me.
18      Q.   And when you would get an assignment to
19 go and do an investigation, what would be the
20 first things you would do to start that
21 investigation?
22      A.   Read whatever report was available from
23 the complainant, if it was an outside complaint.
24 If it was an internal type of thing, I would read
25 whatever reports were generated from the internal

```
 1      A.   I just remember Wills and Thompson.
 2      Q.   Okay.  Once you got their names, did you
 3  go and interview Wills and/or Thompson?
 4      A.   Wills.
 5      Q.   You did not interview Thompson?
 6      A.   Either he was not available -- I'll
 7  be -- to be honest with you, I don't remember.  I
 8  don't believe I interviewed Thompson.
 9  MS. BROOM:
10           Don't speculate.  Only state what you
11  remember.
12  THE WITNESS:
13           I just know that I interviewed Wills
14  because I have notes on that.
15  MR. WATTS:
16      Q.   And that was going to be my next
17  question.  Did you record the interview?
18      A.   No.
19      Q.   When you worked at Professional
20  Standards, was it a normal procedure to record
21  interviews with correctional officers?
22      A.   It depended on the situation.
23      Q.   What would it depend upon?
24      A.   If it was just a minor incident, I would
25  just try to go down and interview as many people
```

```
 1        A.   She provided me with medical records,
 2   and I read them to see what they put down.  I
 3   mean, that was their official documentation of the
 4   incident.
 5        Q.   Did you record the interview with
 6   Ms. Parker?
 7        A.   No.
 8        Q.   So you just read her records.  Did she
 9   have any impressions herself?  Did she make any
10   statements to you?
11        A.   I don't remember.
12        Q.   Did you make any notes of any statements
13   that she would have made?
14        A.   I just read the report.
15        Q.   Did you make any notes of the statements
16   of Mr. Wills that are not contained in the report?
17        A.   I have my notes right here.
18        Q.   Do you mind if I look at those?
19   MS. BROOM:
20             Those have been produced in discovery as
21   well.
22   MR. WATTS:
23             I'll make these the next exhibit.  It
24   will be Exhibit 20.
25             (Exhibit 20 was marked.)
```

1   A.   I didn't see that.  I don't remember
2   seeing that.
3   Q.   Did you just stop watching it after they
4   took him to the ground?
5   A.   Yeah.  After we saw that he did
6   something to allow them to use the use of force.
7   That's all I was looking to see, if they actually
8   had a reason to take him to the ground.  And when
9   I saw that, I realized that Wills was telling me a
10  true statement, that he did try to strike Morgan
11  Thompson.
12  Q.   Did Mr. Campbell save a copy of this
13  digital recording?
14  A.   I don't know.
15  Q.   Was it his normal procedure to save
16  copies of digital recordings?
17  A.   I don't know what his -- what his -- it
18  was up to him to do whatever he wanted with it,
19  sir.
20  Q.   Did Mr. Campbell tell you that Mr. Seal
21  had been in certain chat rooms on-line and was
22  saying things about this incident?
23  A.   I don't know anything about that.
24  Q.   Were you aware that Mr. Campbell called
25  Mr. Seal and talked to him about this incident?

1   A.   I was not aware.
2   Q.   You were not aware.  Are you aware that
3   he recorded that conversation?
4   A.   I don't know.
5   Q.   When you do an investigation such as
6   this one in Seal, is it normal for you and
7   Mr. Campbell to talk to the complainant?
8   A.   No, not normal.
9   Q.   Are you aware that there's a number of
10  correctional officers, specifically from the
11  booking room, that have pled guilty to certain
12  crimes?
13  A.   I read that in the newspaper.
14  Q.   And we've marked as exhibits some of
15  their plea agreements.  And I'll just take Exhibit
16  6, for example, and it's Morgan Thompson's plea
17  agreement.  And it says --
18  MS. BROOM:
19       I'm going to object to the extent we're
20  going outside his designation into the
21  investigation of Seal.
22  MR. WATTS:
23  Q.   Morgan Thompson said that he conspired
24  with employees of the jail acting under the color
25  of law to injure, threaten, intimidate inmates by