```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      SOUTHERN DIVISION

 3


 4   GARY BRICE McBAY,
          Plaintiff,
 5


 6   VERSUS              CIVIL ACTION NO: 1:07cv1205LG-RHW

 7

     HARRISON COUNTY, MISSISSIPPI,
 8   by and through its Board of
     Supervisors; HARRISON COUNTY
 9   SHERIFF, George Payne, in his
     official capacity; CORRECTIONS
10   OFFICER MORGAN THOMPSON,
     acting under color of state law,
11        Defendants.

12

13
              30(b)(6) DEPOSITION OF HARRISON
14              COUNTY SHERIFF'S DEPARTMENT,
               STEPHEN E. CAMPBELL, DESIGNEE
15

16        Taken at the offices of Dukes, Dukes,
          Keating & Faneca, P.A., 2909 13th
17        Street, Sixth Floor, Gulfport,
          Mississippi, on Thursday, October 1,
18        2009, beginning at 1:23 p.m.

19


20   APPEARANCES:

21        PATRICK R. BUCHANAN, ESQUIRE
          MARK V. WATTS, ESQUIRE
22        Brown Buchanan, P.A.
          796 Vieux Marche' Mall, Suite 1
23        Biloxi, Mississippi  39530
               ATTORNEYS FOR PLAINTIFF
24

25
```

EXHIBIT E

```
 1         A.    I understand.
 2   MR. GEWIN:
 3            Mark, let me interrupt you before you go
 4   any further.
 5   MR. WATTS:
 6            Sure.
 7   MR. GEWIN:
 8            This is information that Mr. Campbell
 9   provided to us, not today, but fairly recently.
10   It's three documents.  There's an audiotape that
11   Mr. Campbell brought us.  These are from his home.
12   I believe this is the Seal audiotape from a phone
13   conversation.  And he brought us a DVD that he had
14   at home, which had music on it.
15   MR. WATTS:
16            Had just music on it?
17   MR. GEWIN:
18            Music.
19   MR. WATTS:
20            Can we go off the record?
21   MR. GEWIN:
22            Sure.
23   MR. WATTS:
24            And is it okay if we can listen to
25   the --
```

```
 1    MR. GEWIN:
 2              Yeah.  I thought y'all might want to do
 3    that.
 4                    (Off the record.)
 5    MR. WATTS:
 6         Q.   Mr. Campbell, how long did you work for
 7    the Harrison County Sheriff's Department?
 8         A.   I went to work there the first of
 9    September 2002, and I left -- I got off the
10    payroll the middle of January 2008.
11         Q.   Okay.  Why did you leave the sheriff's
12    department?
13         A.   There was a new sheriff in town.  I
14    wasn't invited.
15         Q.   So you voluntarily left?
16         A.   Yeah.  Yeah.
17         Q.   Did you talk to the new sheriff and want
18    to stay or anything?
19         A.   No.  He and I didn't agree back when he
20    was with the sheriff's department.  We just --
21    well, anyway, so I just -- I knew I wasn't going
22    to be there, so I just asked him -- I told him I'd
23    like to resign.  He said okay.
24         Q.   He didn't ask you to stay?
25         A.   No, no.  I knew he wasn't going to ask
```

```
 1       Q.    And once you learned how to create a DVD
 2  from your digital recordings in the booking room,
 3  if there was an investigation and there was a
 4  digital recording of the alleged incident, would
 5  that DVD be put in that file?
 6       A.    No.
 7       Q.    Why?
 8       A.    Because I didn't make a DVD.  I put it
 9  on my hard drive.
10       Q.    But you knew how to make DVDs, correct?
11       A.    Correct.
12       Q.    And you just chose not to put them in
13  the file?
14       A.    Some of them I did; some of them I
15  didn't.
16       Q.    What made you choose to or choose not
17  to?  What was the factors involved there?
18       A.    Well, the first one I did was Kasey
19  Alves because, you know, it was -- somebody -- the
20  Department of Justice got involved in that one, so
21  I made a copy of that.  I made a copy of Jessie
22  Lee Williams and -- but I saved them in the hard
23  drive, other ones, and I might have probably -- I
24  might have made copies of some other ones.
25       Q.    When you did an investigation and there
```

1    A.   Yes.  I think I was returning his call.

2    Q.   And in the conversation we heard, that
3 was you calling him?  You were returning his call?

4    A.   Correct.

5    Q.   Is that the only time that you've taped
6 Mr. Seal in a conversation?

7    A.   No.  The other one, it was mentioned on
8 that tape.  There was a first one when I talked to
9 him, but I don't know where it's at.

10   Q.   Did you tell him that you were taping
11 him?

12   A.   No.

13   Q.   Where was that tape kept?

14   A.   I kept them.

15   Q.   In your office?

16   A.   In my office.

17   Q.   Okay.  And then after you retired, you
18 took the tapes with you?

19   A.   Some of them.  Some of them were gone.

20   Q.   What do you mean "gone"?

21   A.   They were just gone.  I don't know where
22 they are.  From when the head -- I mean, the
23 Department of Justice guys came down -- anyway,
24 they gave me a target letter, and so the sheriff
25 had a policy -- he put me on administrative leave.

1  drive?

2  A. Yeah, probably. Usually that's how I
3  would do it, by the name.

4  Q. If you save something to your hard drive
5  and somebody made -- is that -- I'm sorry. I'm
6  messing up. Is the reason you save something to
7  your hard drive, a video, is because someone made
8  a complaint and you were doing an investigation?

9  A. Right. Most of the time, sure.

10  Q. And if you did an investigation and
11  there was a video and you saved it to your hard
12  drive, would you ever delete those later?

13  A. Would I delete them?

14  Q. Yeah.

15  A. No.

16  Q. Was it a policy of anyone to delete
17  videos after a certain amount of time?

18  A. No. I kept everything.

19  Q. Would you agree that if you -- if
20  someone makes a complaint and an investigation is
21  made and there's a video involved, that that video
22  should be kept for a certain amount of time?

23  A. And it was. It was kept -- I know it
24  was kept till I left.

25  Q. What's the standard amount of time a

1   video is kept?
2       A.   I kept them forever.  If I was still
3   there, I'd still have them.  But this happened --
4   with Seal, that was 2005, and I left in
5   January 2008.  And as far as I knew, it was still
6   there, and there wasn't no lawsuit or anything
7   filed, so -- I mean, I didn't delete it.
8       Q.   And as far as your knowledge of the
9   system, the hard drive that this video was saved
10  to, if it was deleted, would someone have to
11  intentionally delete it?
12      A.   It had the Windows program on it.  Okay.
13  And you just save it, saved it to a file like you
14  do anything else.  And I don't think it would just
15  delete itself.
16      Q.   Fair enough.  Was it a policy of the
17  jail, if someone made a complaint and there was a
18  video about it and an investigation was made, to
19  keep those videos for a certain amount of time?
20  Did you institute a policy to keep those videos a
21  certain amount of time?
22      A.   I didn't write a policy.  I just kept
23  them.
24      Q.   Did you tell people in the jail that
25  these things should be kept for a minimum of three