**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**WILLIAM DAVID SEAL**                                                                 **PLAINTIFF**

**VERSUS**                                              **CAUSE NO: 1:08-CV-175-LG-RHW**

**HARRISON COUNTY, MISSISSIPPI, et al.**                 **DEFENDANT(S)**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, William David Seal ("Seal"), by and through his undersigned counsel, submits this Response in Opposition to Defendant Thomas Wills and Morgan Thompson's ("Defendant") Motion for Summary Judgment and would show unto the Court, the following:

In the case at bar, genuine issues of material fact exist which should preclude summary judgment. First, the excessive force employed against Mr. Seal by the correctional officers has two different versions – Mr. Seal has one version and the Defendants have another. Moreover, the unbiased eye of the surveillance video of the incident was destroyed by the Defendants, after the lawsuit was filed, which precludes anyone from viewing it; therefore, this matter boils down to a he said/he said matter. Second, the injuries sustained by Mr. Seal is a genuine issue of material fact due to the physical evidence and various accounts of the injuries sustained. Third, Third, there are genuine issues of materials fact with respect to Defendants' qualified immunity claim because his actions were not objectively reasonable and were in violation of Mr. Seal's constitutional rights. Finally, there exists enough genuine issues of material fact with respect to the conspiracy claims to preclude summary judgment.

Accordingly, Defendant's Motion for Summary Judgment should be denied due to numerous genuine issues of material fact.

**I.     Summary Judgment Standard**

"Summary judgment is proper when there exists no genuine issue of material fact and the movant is entitled to judgment as matter of law." *Strong v. Univ. HealthCare Sys.*, L.L.C., 482 F.3d 802, 805 (5th Cir. 2007). "The evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant." *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 465 (5th Cir. 2005). To survive a summary judgment motion, the nonmovant "need only present evidence from which a jury might return a verdict in his favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**II.    Excessive Force Used Against Mr. Seal**

   **A.    Applicable Law**

The appropriate analysis of excessive force claims by pre-trial detainees is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993). Often, there is no evidence of the correctional officer's subjective intent, ad the trier of fact must base its determination on objective factors suggestive of intent. *Id.* at 1446. The Fifth Circuit suggests the following factors: (1) extent of the injury suffered; (2) need for the application of force; (3) relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of the forceful response. *Id.* at 1447. An officer's malice can be evident from the very excessiveness of his conduct. *Id.*

   **B.    Facts**

Plaintiff was brought to the HCADC on the night of September 4, 2005 on suspicion of public drunk and harassing phone calls. Upon arriving at the HCADC, Mr. Seal was awaiting

processing by the HCADC, and requested medical attention to address a wound that had been bleeding. Exhibit "A" William David Seal deposition p. 83, Lines 5-17. This wound was the result of Gulfport police officers physical abuse of Mr. Seal while arresting him that night.

The officers told Mr. Seal to come to the booking counter and place his hands on the counter. *Id*. at p. 84, Lines 1-3. Mr. Seal placed his hands on the counter, and the officers stretched his body out and released the cuffs. *Id.* at p. 84, Lines 5-11. The officers ordered Mr. Seal back against the wall, and Mr. Seal complied. *Id.* Mr. Seal demanded medical treatment again, but the officers refused. *Id.* Defendant Thomas Wills, in a sarcastic and condescending manner, told Mr. Seal that he would just throw some peroxide on his "little wound." *Id.* at p. 85, Lines 5-18.

Mr. Seal again requested to see a nurse for his wound, and Defendant Wills and Mr. Seal exchanged words with respect to the wound. *Id.* at p. 87-88, Lines 11-8. Mr. Seal remained against the wall. After a few minutes of requesting medical treatment, booking officers came from behind their cage area and attacked Mr. Seal. *Id.* at pp. 88-89, Lines 14-2. As the officers came from around the cage area, Mr. Seal began walking towards them with his hands in the air in an attempt to show the officers that he had no beef with them. *Id.* at pp. 90-91, Lines 20-12. Mr. Seal believed they were coming to assault him, and he did not want to put a resistance in the hopes that they would not assault him. *Id.* Mr. Seal did not attempt to strike any of the officers, he put his hands in the air as if to give up. *Id.* at pp. 91-92, Lines 25-24. Defendant Thompson and Defendant Wills grabbed Mr. Seal and slammed him to the ground, left eyebrow first. *Id.* at pp. 88-89, Lines 14-2. Thompson put Mr. Seal in a choke hold, and Wills grabbed and twisted Mr. Seal's thumb. *Id.* Mr. Seal's left brow began bleeding profusely once Mr. Seal brow was driven to the concrete floor. *Id.* at p. 94, Lines 12-23. The choke hold applied caused Mr. Seal

to pass out. *Id.* at pp. 88-89, Lines 14-2.

A nurse came down to the booking area to see Mr. Seal, and the nurse stated that Mr. Seal should go out to medical to see a doctor. *Id.* at p. 102, Lines 15-21. The officers refused at that time. *Id.* About fifteen hours later, Mr. Seal was taken to Memorial Hospital; however, too much time had passed to properly suture the wound. *Id.* at pp. 104-105, Lines 18-21. Once Mr. Seal was taken back to the jail, he was put in general population, but Mr. Seal was not given a spoon and cup for nutrition. *Id.* at p. 107-108, Lines 5-23.

  **C.** **Genuine Issues of Material Fact**

There are significant, genuine issues of material fact with respect to the correctional officers' unnecessary use of force upon Mr. Seal. First, the digital video of the incident was destroyed by the Defendants after the lawsuit was filed. The unbiased eye of the surveillance video would have provided the images necessary to determine what actually happened in the booking room. This topic has been thoroughly briefed by the parties via Mr. Seal's pending Motion for Sanctions for Spoliation. This missing tape creates a genuine issue of material fact as to what happened in the booking area on the night of September 4, 2005. Without the surveillance video, this matter is a he said/he said version of events, and thus, summary judgment is inappropriate.

**III.** **Plaintiff's Injuries**

  **A.** **Evidence of Injuries**

The Defendant maintains that Mr. Seal's injuries were caused by the Gulfport police department before Mr. Seal's arrival at the jail; however, this is specifically disputed as discussed *supra*. Mr. Seal's left cheek had bled as a result of the actions of the Gulfport police department. Exhibit "A", Seal depo, p. 97, Lines 15-23. Mr. Seal's permanent nerve damage to his eye and

resulting severe anxiety are the result of the actions of booking officers at the HCADC.

It is undisputed that Mr. Seal had a large gash which required stitching. The only dispute is who caused the gash and permanent nerve damage. This genuine issue of material fact should preclude summary judgment. Essentially, Defendant asserts pre-existing injuries to Mr. Seal; however, any alleged pre-existing physical or mental problems of Mr. Seal are a question of fact for the jury to decide, not summary judgment evidence. Under Mississippi law, "[O]ne who injures another suffering from a pre-existing condition is liable for the entire damage when no apportionment can be made between the pre-existing condition and the damage caused by the defendant-thus the defendant must take his victim as he finds her." *Brake v. Speed*, 605 So.2d 28, 33 (Miss. 1992). Genuine issues exist as to the apportionment, if any, between any alleged pre-existing condition and the damage caused by the Defendants. As such, genuine issues of material fact should preclude Defendant's motion for summary judgment.

### B. Injuries More Than *De Minimus*

With respect to the excessive force claim, the Defendant's motion for summary judgment asserts that Plaintiff cannot establish that he suffered no more than a *de minimis* injury.

In *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), the Supreme Court held that a correctional officer's use of excessive physical force against a prisoner may in an appropriate setting constitute cruel and unusual punishment of the prisoner, contrary to the Eighth Amendment, even though the prisoner does not suffer either "significant injury" or "serious injury." *Id.* 112 S.Ct. at 997 ("serious injury"), 998 ("significant in-jury"), 999 ("serious injury"), 1000 ("significant injury"). Likewise, *Hudson* clearly implies that merely because the injury suffered is only "'minor'" does not of itself always preclude finding an excessive force violation. *Id.* at 1000. *Hudson*, looked largely to "whether force was applied in a good-faith

5

effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* 112 S.Ct. at 999. For purposes of this inquiry, *Hudson* placed primary emphasis on the degree of force employed in relation to the apparent need for it, as distinguished from the extent of injury suffered. *Id.*

A showing of some type of injury, more than *de minimus*, is necessary to assert an excessive force claim. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). In order to determine whether injuries caused by excessive force are *de minimus*, **the context in which the force was used must be examined**. *Id.* (emphasis added). "[T]he amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances.'"" *Id.* at 703-04 quoting *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996)).

In *Gomez v. Chandler*, 163 F.3d 921 (5th Cir. 1999), in concluding that a prisoner's injury was not *de minimis*, the Court stated that the "application of force" was "of a character far [more] intense and [more] calculated to produce real physical harm," *Gomez*, 163 F.3d at 924. The focus was on the application of force under the context, not the extent of the physical injury suffered.

As the Fifth Circuit stated in *Beck v. Alford*, 1994 WL 442383 at *1 (5th Cir. July 27, 1994), when "there are allegations of injury together with circumstances that suggest that more than *de minimis* injury ***could have occurred***, or that the use of whatever force there was would shock the conscience, the stage is set for a credibility contest, and the case should go to a finder of fact." (emphasis added). It is clear that the law in Fifth Circuit focuses on the application of force, the context the force was used, and the injury that could have happened, not what injury actually did occur.

In the instant matter, it is clear that Mr. Seal had a large gash above his eye as a result of the actions of the booking officers at the HCADC. This resulted in permanent nerve damage. As for Defendant's citation to *Siglar*, *Siglar* dealt with an inmate receiving a bruised ear from the officer twisting it. The Court held that this action did not rise to the level of excessive force and a constitutional violation, and thus, the injury was *de minimus*. In *Siglar* and the other cases discussed above, the focus is not on the resulting injury, but the context of the officers' actions and what harm could have happened to the plaintiff. In this matter, the officers unnecessarily and unjustifiably took Mr. Seal to the concrete floor, eye brow first, and caused permanent nerve damage. There is no doubt that these actions did result in injuries, and could have resulted in far more serious injuries. Defendant's 30(b)(6) designee, Captain Steve Campbell, who investigated use of force complaints, stated that when a person is taken to the ground face first, indeed, serious injuries can occur. Exhibit "B" 30(b)(6) designee, Steve Campbell deposition *Id.* at p. 104-106, Lines24-4. The officers' actions in this context were not to restore discipline, but these actions were meant to punish and cause harm to Mr. Seal. The injuries and the circumstances clearly meet the threshold of more than *de minimus*.

In the instant matter, genuine issues of material fact exist regarding the need and amount of force used by the correctional officer; therefore, the Plaintiff's injuries cannot be determined to be *de minimus* simply by evaluating the physical nature of the injury. See *Hull v. Ford*, 2007 WL 1839843 (5th Cir. June 25, 2007).

IV.     **Qualified Immunity**

    A.     **Applicable Law**

The doctrine of qualified immunity shields a government official performing discretionary functions from civil damages liability, provided his complained of actions meet the

test of "objective legal reasonableness." *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982). The Fifth Circuit assesses the "objective reasonableness" of an officer's actions in light of legal rules that were "clearly established" at the time those actions were taken. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Once a defendant pleads a defense of qualified immunity, the trial judge must first determine "whether the plaintiff has alleged a constitutional violation at all" under current law. *Siegert v. Gilley*, 500 U.S. 226, 231-32, 111 S.Ct. 1789, 1792-93, 114 L.Ed.2d 277 (1991). If the plaintiff has done so, the judge then determines whether the defendant's actions were "objectively reasonable" with reference to "clearly established law" at the time of the conduct in question. *Siegert*, 500 U.S. at 231, 111 S.Ct. at 1792-93.

### B. Application of Law to Facts

In the case at bar, as noted above, there is sufficient evidence to support the finding that Morgan Thompson and Thomas Wills used excessive force against Mr. Seal in violation of his constitutional rights. Moreover, there is sufficient evidence to find that Thompson's and Wills' actions were not objectively reasonable. At the time of the incident, it was clearly established that inmates and pre-trial detainees have a constitutional right to be free from the use of excessive force. See, e.g., *Hudson v. McMillian*, 503 U.S. 1, 5-10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Thompson and Will's claim of qualified immunity should be denied.

## V. Conspiracy

There exist numerous issues of genuine material fact with respect to a conspiracy among the booking officers.

### 1. Plea Agreements

Former correctional officers have signed plea agreements and entered guilty pleas for violations of prisoners/pre-trial detainees civil rights. See Exhibit "C". In the plea agreements, Regina Rhodes, Morgan Thompson, Daniel Evans, Karl Stolze, Thomas Wills, Dedri Caldwell, and William Jeffery Priest each admitted to assaulting and witnessing assaults of inmates at the detention center. Thompson and Caldwell admitted they each participated in over 100 assaults against inmates between May 17, 2004 and August 28, 2006. Evans admitted he had participated in several assaults against inmates and witnessed numerous assaults of inmates by other officers. Stolze admitted he participated in several assaults against inmates and he and his co-conspirators "engaged in a pattern of conduct that included, but was not limited to . . . assaulting inmates, knowing that the physical force was unnecessary, unreasonable, and unjustified." William Jeffery Priest also admitted he committed numerous assaults on inmates. The conduct described in the plea agreements includes punching, kicking, and choking inmates. These officers also admitted they submitted false and misleading reports regarding their misconduct.

### 2. Steve Martin Report

Steve Martin investigated the HCADC on behalf of the Department of Justice. Martin submitted a report, dated February 1, 2005, wherein he stated there was a "very disturbing pattern of misuse of force" at the HCADC. See Exhibit "D", Martin report. This report was sent to both the Sheriff and Harrison County Board of Supervisors. See Exhibit "E", Letter dated July 20, 2005.

Sheriff George Payne admitted receiving Martin's report. During his deposition, Sheriff Payne stated that he assigned Major Riley and Steve Campbell, of the Professional Standards Unit, to investigate the claims in the report. See Exhibit "F", p. 24 Lines1-13. However, during the deposition of 30(b)(6) designee Steve Campbell, Campbell stated that he was never requested

by Sheriff Payne to investigate these claims contained in the report. Exhibit "B", p. 54, lines 9-15. Indeed, when asked about Steve Martin, Campbell stated, "[W]ell, what I got from him was inmates never do anything wrong, correction officers always screw up." *Id.* at p. 52, Lines 5-7.

Now, Sheriff Payne has submitted an affidavit wherein he states that once he received Martin's report, he forwarded it to the Federal Bureau of Investigation; however, Sheriff Payne never mentioned this during his deposition and no record has been produced showing the report was forwarded to the FBI. It is clear that there are conflicting accounts as to whether the Sheriff took this report seriously. Sheriff Payne stated that he requested Campbell to investigate, but Campbell denies this occurred. Sheriff Payne did not mention the FBI with respect to the report during the deposition, but in support of the summary judgment motion, he now mentions it involves the FBI. Clearly, the prison officials such as Campbell did not think too highly of Martin, and did not take his report seriously.

Martin's report provides official notice to both the Sheriff and Board of Supervisors about the escalating violence at the jail. However, as is evident in the plea agreements with respect to the time frame of abuse (2004-2006), the officials in charge did nothing to discourage such violence despite being on notice that it was occurring

### 3. Regina Rhodes Deposition

Regina Rhodes testified that the practice of abuse of inmates "was almost daily" while she was employed at HCADC from 2004 to 2006. Exhibit "G", Regina Rhodes deposition p. 14, Lines 3-9. Rhodes described the pattern of abuse that she personally observed while she worked in booking at the HCADC. Rhodes described practices such as: red light/green light (*i.e.* abusing detainees in areas that would not be visible); targeting and taunting of persons who had been brought in on drinking charges or were drunk; falsifying reports; encouragement to falsify

10

reports; special names for days of the week; and beating, kicking and otherwise abusing inmates. *Id.* pp. 9-18. Rhodes specifically stated that the language used in the investigative report with respect to Mr. Seal's incident tracks the language that was normally used in falsifying reports. *Id.* p. 21, Lines 3-15.

This abuse and violence was so widespread and over such a period of time that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had either actual or constructive knowledge of the activities.

### 4. Teel Trial Testimony

The correctional officers testified that they frequently referred to an unofficial policy of "red light, green light," which meant that officers should only strike inmates in areas that would be concealed by the jumpsuit worn by prisoners. See Exhibit "H", William Priest testimony, p. 424, Lines 11-16. The face and head would therefore be considered a "red light," while the chest would be considered a "green light." The officers also testified regarding ways in which they would "fool" the surveillance cameras in booking to make it appear that inmates were resisting when in fact they were not. *Id.* at p. 408. They also testified that they would yell "stop resisting" to make others believe their violence against inmates was in response to resistance by the inmates. *Id.* at p. 435. The officers also had special names for the days of the week, such as "Thump a Thug Thursday." See Exhibit "I", Moore testimony, p. 556. The officers felt that the unnecessary assaults were funny and humorous. See Exhibits "H" and "I". Defendant Thompson testified that he felt like he lost touch with humanity and forgot that these inmates were human beings, and he confirmed this belief in his deposition testimony in this matter. Exhibit "J" Morgan Thompson deposition p. 44, Lines 10-18.

This abuse and violence was so widespread and over such a period of time that Sheriff

George Payne, in his official capacity, and the Harrison County Board of Supervisors had either actual or constructive knowledge of the activities.

Using the evidence that is discussed at length *supra*, there are genuine issues of material fact with respect to whether a conspiracy to assault inmates was a moving force behind the violation of Plaintiff's constitutional rights.

In summary, there are numerous genuine issues of material fact which preclude summary judgment in this matter. Accordingly, the Court should deny Defendant's Motion for Summary Judgment.

        RESPECTFULLY SUBMITTED

        WILLIAM DAVID SEAL, Plaintiff

        BY:    BROWN BUCHANAN, P.A.


        BY:    */s/Patrick R. Buchanan*_____
                   PATRICK R. BUCHANAN
                   MARK V. WATTS

## **CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that I have this day mailed by United States mail, postage prepaid, a true and correct copy of the foregoing pleading to the following counsel:

Karen Jobe Young
Meadows Law Firm
Post Office Box 1076
Gulfport, MS  39502

Cyril T. Faneca
Haley Necaise Broom
Joe Crawford Gewin
Dukes, Dukes, Keating & Faneca
Post Office Drawer W
Gulfport, MS  39502-0680

Ian A. Brendel
James L. Davis III
Post Office Box 1839
Gulfport, MS  39502-1839

This, the 14th day of December, 2009.

/s/ Patrick R. Buchanan
PATRICK R. BUCHANAN

PATRICK R. BUCHANAN (MSB #8439)
MARK V. WATTS (MSB #102204)
BROWN BUCHANAN, P.A.
796 VIEUX MARCHE, SUITE 1
POST OFFICE BOX 1377
BILOXI, MS  39533-1377
TELEPHONE: (228) 374-2999
FACSIMILE:   (228) 435-7090