# Exhibit A

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                    SOUTHERN DIVISION
 3
 4   WILLIAM DAVID SEAL,
          Plaintiff,
 5
 6   VERSUS            CIVIL ACTION NO: 1:08cv175LG-RHW
 7
     HARRISON COUNTY, MISSISSIPPI,
 8   by and through its Board of
     Supervisors; HARRISON COUNTY
 9   SHERIFF, George Payne, in his
     official capacity; CORRECTIONS
10   OFFICER THOMAS PRESTON WILLS,
     acting under color of state
11   law; CORRECTIONS OFFICER RYAN
     TEEL, acting under color of
12   state law; CORRECTIONS OFFICER
     MORGAN THOMPSON, acting under
13   color of state law,
          Defendants.
14
15
16         DEPOSITION OF WILLIAM DAVID SEAL
17
18        Taken at the offices of Brown Buchanan,
          P.A., 796 Vieux Marche' Mall, Suite 1,
19        Biloxi, Mississippi, on Thursday,
          August 20, 2009, beginning at 9:30 p.m.
20
21
     APPEARANCES:
22
          PATRICK R. BUCHANAN, ESQUIRE
23        Brown Buchanan, P.A.
          796 Vieux Marche' Mall, Suite 1
24        Biloxi, Mississippi  39530
             ATTORNEY FOR PLAINTIFF
25
```

```
 1        A.   Yes, ma'am.
 2        Q.   -- when you entered the Harrison County
 3   jail?
 4        A.   Yes, ma'am.
 5        Q.   Now, once you entered the jail, isn't it
 6   true that you wanted a nurse to dress your wounds
 7   and attend to your wounds at that time?
 8        A.   Yes, ma'am.
 9        Q.   Okay.  And according to your complaint,
10   they didn't, correct?
11        A.   True.
12        Q.   And what wound is this that you're
13   wanting them to dress?
14        A.   I don't know.
15        Q.   Okay.  So you're just asking them to
16   attend to the wounds that were bleeding, correct?
17        A.   Right.  Had bled.
18        Q.   Had bled, I'm sorry.  Now, you were
19   ordered to go and stand and put your hands on the
20   counter, the booking counter at the jail, weren't
21   you?
22        A.   Yes, ma'am.
23        Q.   But you didn't; you started flailing
24   around?
25        A.   No, ma'am.
```

```
1        Q.    Okay.  What did you do when they ordered
2   you to put your hands on the counter?
3        A.    Put my hands on the counter.
4        Q.    And then what happened next?
5        A.    They did the -- stretched me just as far
6   as possible.  They had released the cuffs.  They
7   told me to stand back against the wall.  I was
8   standing there.  That's when I demanded medical
9   treatment again.  They didn't want to do it.  I
10  demanded medical treatment again.  They didn't
11  want to do it.
12       Q.    If I can stop you there if you don't
13  mind.
14       A.    Yes, ma'am.
15       Q.    Why were you demanding medical treatment
16  at that time?  Were you in pain?
17       A.    No.  I saw that I had bled.
18       Q.    Okay.  So you saw blood on your shirt,
19  so you were demanding --
20       A.    On my body.
21       Q.    -- medical treatment?
22       A.    I didn't have a shirt on.
23       Q.    Okay.  Did you have any other scuffs or
24  anything on your body?
25       A.    Not that I recall.
```

1      Q.    But you saw blood on your body, so you

2    knew -- or you wanted medical treatment?

3      A.    Yes, ma'am.

4      Q.    Okay.  And then what happened next?

5      A.    They refused.  They told me to stand

6    back against the wall.  I stood back against the

7    wall.  Wills, Officer Wills, Correction Officer

8    Wills said, well, we'll just get some peroxide or

9    some alcohol and pour it on your little wound.  I

10   said, no, you will not do such a thing because

11   you're not going to pour a caustic substance in a

12   fresh wound and make the wound worse.

13     Q.    Okay.  If I can stop you there.  So

14   Officer Wills did offer --

15     A.    No.

16     Q.    -- to give you some medical treatment?

17     A.    That was a smart aleck response, in my

18   opinion.

19     Q.    In your opinion.  But he did offer to

20   pour some peroxide on your wound?

21     A.    Which is rather stupid medically, I'm

22   saying.

23   MR. BUCHANAN:

24         Answer her question.

25   THE WITNESS:

1           Yes, ma'am.

2     MS. BROOM:

3           Q.    So you disagree with the treatment he

4     was offering?

5           A.    Absolutely.

6           Q.    But he did offer it?

7           A.    Yes.

8           Q.    Okay.  And you disagreed with it because

9     you're a nurse and you thought you knew better,

10    correct?

11          A.    Yes.  I know I know better.  I'm sorry.

12          Q.    I'm not going to dispute that, but --

13                And then what happened after he offered

14    the treatment and you declined it?  Then what

15    happened?

16    MR. BUCHANAN:

17                By "treatment," you're meaning when he

18    offered to pour peroxide on him?

19    MS. BROOM:

20                Correct.

21    THE WITNESS:

22                And alcohol.

23    MR. BUCHANAN:

24                And alcohol.

25    MS. BROOM:

```
 1              Okay.
 2   MR. BUCHANAN:
 3              What happened next?
 4       A.    As I recall, Wills and I kind of went
 5   back and forth.
 6   MS. BROOM:
 7       Q.    Verbally?
 8       A.    Verbally.
 9       Q.    Okay.  Where were you standing at that
10   moment?
11       A.    Back against that wall.
12       Q.    Was the Gulfport Police Department
13   officer still there?
14       A.    I remember him coming in giving the
15   corrections officers the paperwork and leave.
16       Q.    Okay.  So you're back against the wall?
17       A.    Yes, ma'am.
18       Q.    And is it just you and Wills there?
19       A.    No.  There was several other correction
20   officers back behind the cage.
21       Q.    Okay.  And then what happened next?  How
22   long did y'all have this verbal altercation, or
23   verbal argument rather?
24       A.    Maybe five minutes.  And --
25       Q.    What was said during this argument; do
```

1    you know?

2         A.    Kind of debating over him saying that he

3    was going to put alcohol and peroxide on the wound

4    and him continuing it, and I said, no, you're not.

5    And I told him -- what did I tell him?  I told him

6    again that I wanted to see the nurse for

7    treatment.  And I can't remember exactly which,

8    but there were curse words exchanged between --

9         Q.    So you're admitting that you were using

10   profane language against Wills?

11        A.    I admit that, and I admit that he was,

12   also.  And he said, Motherfucker, just wait a

13   minute.

14               Okay.  So whatever he was doing, got

15   through.  They came around the side of booking,

16   and I remember Thompson grabbing me, along with --

17   I can remember Thompson and Wills.  Those are the

18   two I can really remember -- I know there was

19   others there -- and slamming me to the ground and

20   slamming my eyebrow into the pavement.  I swear to

21   God I remember that.  And I remember Thompson

22   putting my head into a choke hold, Wills grabbing

23   my thumb, and I do remember passing out.  I

24   remember coming to, and one of the corrections

25   officers said, put the cuffs on just as tight as

Page 89

```
 1    you can.  And then they put me back up against the
 2    wall, and I was sitting there.
 3         Q.   Okay.  Let's stop there, if you don't
 4    mind --
 5         A.   Yes, ma'am.
 6         Q.   -- and go back through this.  Now, when
 7    y'all were back against the wall, you and Wills
 8    had some argument, according to you.  And then he
 9    left, I'm assuming, because you said he came back.
10         A.   They went back behind the cage after.
11         Q.   Were y'all arguing from him being behind
12    the booking counter to you on the wall?  Were
13    y'all arguing amongst yourselves at that time?
14         A.   No.  After they had put the choke hold
15    on me and I --
16         Q.   Before the choke hold.  I'm sorry.  Just
17    the argument that y'all had about the peroxide.
18         A.   We were doing what, now?
19         Q.   Where were y'all when you were arguing?
20    You were against the wall, and where was Wills?
21         A.   I was against the wall.  He was in the
22    cage.
23         Q.   Okay.  And then when he came around,
24    when Wills came around --
25         A.   With the other ones.
```

1      Q.  So you're testifying that Wills and

2  Thompson both walked around the --

3      A.  And a couple of others.

4      Q.  Okay.  Let me finish my question.

5      A.  Oh, I'm sorry.

6      Q.  Were you ordered to come up to the

7  counter at that time?

8      A.  No.

9      Q.  Okay.  So you never came to the counter,

10  the booking counter?

11  MR. BUCHANAN:

12      You mean after he had already been

13  there?

14  MS. BROOM:

15      Right.

16  MR. BUCHANAN:

17      Because he testified earlier --

18  MS. BROOM:

19      Right.  I'm sorry.

20      Q.  After you had the argument while you

21  were on the wall, did you ever come back to the

22  booking counter?

23      A.  No.  I walked towards them --

24      Q.  Right.

25      A.  -- and put my hands up like that when

Page 91

1    they all came out around the cage.

2         Q.   Okay.  Well, let's stop there.  When

3    they walked out, was something said by you or the

4    officers?

5         A.   Not that I recall.

6         Q.   Okay.  Why would you walk from the wall

7    and hold your hands up?

8         A.   Because they come rushing around there

9    like they were going to assault me.

10        Q.   Well, did you know that for sure at that

11   time?

12        A.   In my heart, yes, ma'am.

13        Q.   Okay.  So the officers were walking out.

14   They didn't say anything, correct?

15        A.   Not that I recall.

16        Q.   And they were just walking around the

17   corner?

18   MR. BUCHANAN:

19             Object to the form.

20        A.   No.  They weren't walking around.

21   MS. BROOM:

22        Q.   Okay.  Explain how they were coming

23   around the corner.

24        A.   Coming around rapidly, fast.

25        Q.   And then you started walking toward them

1    at that moment with your hands --

2         A.    With my hands up.

3         Q.    And what were you saying?

4         A.    I don't remember saying anything.

5         Q.    Could you have said something at that

6    time?

7         A.    I don't know if there was time to really

8    say anything.

9         Q.    Okay.  Were you waving your hands

10   around?

11        A.    I just recall putting them up.

12        Q.    Could you have been waving your hands

13   around?

14        A.    No.

15        Q.    But you don't recall, correct?  So

16   either you don't know if you did, you don't recall

17   if you did, or you didn't.  There's a difference.

18   MR. BUCHANAN:

19             Again, tell her what you recall doing

20   for the fifth time.

21        A.    I recall putting my hands up.  If I

22   waved them like that, side to side motion, that's

23   possible.  Fists like a defensive stance or we're

24   going to fight, no, absolutely not.

25   MS. BROOM:

1      Q.     Okay.   And that's my questions.   I mean,

2    I'm going to ask you what you recall, and I'm also

3    going to ask you do you know for certain that you

4    didn't do it.   And there's a difference; you

5    understand that, correct?

6      A.     Yes, ma'am.

7      Q.     So you just stated there's a possibility

8    you could have been waving your hands from side to

9    side?

10     A.     Possibly, yes.

11     Q.     And that was at the time that the

12   officers walked around the corner, correct?

13     A.     Faster than walk, but correct.

14     Q.     I apologize for that.   And then at that

15   moment you're alleging that Officer Wills or

16   Thompson came to you?

17     A.     It was cumulative, but I remember they

18   slammed me to the ground, they being the group.   I

19   don't know which particular one had the most force

20   or greater leverage, or whatever.

21     Q.     Right.

22     A.     I remember, after hitting the pavement,

23   that Thompson put me in the choke hold, Wills

24   grabbed my thumb, and I passed out.   When I came

25   to, one of the correction officers said, put the

1    cuffs on just as tight as you can, and then they

2    placed me back up against the wall.

3         Q.    You're alleging when your body hit the

4    ground, what parts of your body came in contact

5    with the ground?

6         A.    Left brow.

7         Q.    Your left brow that time?

8         A.    Yes, ma'am.

9         Q.    Okay.  And how do you recall that and

10   not whether it did with the Gulfport Police

11   Department --

12        A.    Because right after that, there was

13   blood streaming down through my eye where I could

14   hardly see.

15        Q.    Okay.  So you started bleeding from your

16   left eye is why --

17        A.    Above it, yes, ma'am.

18        Q.    -- you think you hit on the left side of

19   your eye?

20        A.    Yes, ma'am.

21        Q.    Okay.  Did you feel an impact on your

22   left eye?

23        A.    Yes, ma'am.

24        Q.    When did you allegedly become

25   unconscious?

1      A.    Become unconscious?

2      Q.    Uh-huh.  Or lose consciousness.

3      A.    When Wills choked me.

4      Q.    Was that immediately after you hit the
5  ground?

6      A.    Within seconds.

7      Q.    Okay.  Now, you would agree with me that
8  you came off the wall with your hands up without
9  permission?

10     A.    Uh-huh.

11  MR. BRENDEL:

12          Answer out loud.

13  THE WITNESS:

14          Yes, yes, yes, yes, yes.

15  MS. BROOM:

16     Q.    You would agree that you disobeyed the
17  officers, too, correct?  They told you to stand
18  against the wall, didn't they?

19     A.    Yes.

20     Q.    And they were coming towards you, saw
21  you off the wall and took you down, correct?

22     A.    Slammed me down.

23     Q.    They took you down to the ground,
24  correct?

25     A.    That's a way of putting it, correct.

1      Q.    Is that the same way that you would have

2  done in your psych ward?

3      A.    Absolutely not.  I never hurt a patient.

4      Q.    Okay.  I'm not saying that regarding the

5  injury.  But in the hospital, if one of your

6  patients is not listening to you, wouldn't you

7  have taken them down if you felt that your life

8  was in danger or --

9      A.    Right, but I also --

10      Q.    -- they weren't listening to you?

11  MR. BUCHANAN:

12           You've got to let her finish.  You're

13  doing fine.

14  THE WITNESS:

15           I'm sorry, ma'am.  Will you ask it

16  again?

17  MS. BROOM:

18      Q.    That's okay.  It's fine.  Have you ever

19  had occasion to take one of your patients down?

20      A.    Yes, ma'am.

21      Q.    Okay.  Because they weren't listening to

22  you, correct?

23      A.    Well, out of control.

24      Q.    Right.  Okay.  So they took you down to

25  the ground.  What parts of your body hit the

1   ground?

2        A.   Yes.

3        Q.   What parts of your body hit the ground?

4        A.   My left eyebrow.

5        Q.   Okay.  How did your nose not hit the

6   ground?  How did it not make contact and get

7   injured?

8        A.   At an angle.

9        Q.   Okay.  How did your forehead not hit the

10  ground?

11       A.   Part of the brow protrudes a little bit

12  further than the forehead.

13       Q.   How did your cheekbone not hit the

14  ground?

15       A.   This happened by the Gulfport cops, in

16  my opinion.

17       Q.   What happened?

18       A.   This laceration right here.

19       Q.   Your left -- you're pointing to your

20  left cheekbone laceration?

21       A.   Yes, ma'am, left cheekbone.

22       Q.   By the Gulfport cops?

23       A.   In my opinion, yes, ma'am.

24       Q.   Okay.  But what it appears to me is your

25  left cheekbone area protrudes out further than

1    MR. BUCHANAN:

2            Well, if you can, you can.  If you

3    can't, you can't.

4    MS. BROOM:

5        Q.   I'm referencing the first page when the

6    nurse saw you.  Isn't it true that the nurse saw

7    you at 12:20 on 9/5/05?

8    MR. BUCHANAN:

9            Now, are you asking if that's true or if

10   that's what's on the report?

11   MS. BROOM:

12       Q.   Is that true?

13   MR. BUCHANAN:

14           Do you know?

15       A.   I know a nurse, after my beating, did

16   come to booking, did dress it, did tell the cops,

17   correction officers he needs to go out, which is

18   their lingo for needs to go to Memorial, he needs

19   stitches.  They said, no transports available.  So

20   they refused me medical care, absolutely refused

21   me proper medical care.

22   MS. BROOM:

23       Q.   Okay.  And are you aware of whether the

24   facility was having problems contacting Memorial

25   Hospital due to it being five days after the

1    storm?

2        A.    They contacted it when a physician said

3    to send me.

4        Q.    Are you aware that they were on a

5    generator at that time and having problems with

6    the electricity and the phone lines?

7        A.    They have walkie-talkies.

8        Q.    Okay.   Are you aware that they were

9    having problems with the power at that time; they

10   were actually on a generator?

11       A.    I would imagine they would have been.

12   Was I actually aware, no, ma'am.

13       Q.    And you would acknowledge that it was a

14   little bit different circumstances being just

15   within a week from Katrina, correct?

16       A.    Than a normal like today?

17       Q.    Right, right.

18       A.    Yes, ma'am.

19       Q.    Are you disputing that you did see the

20   doctor at 12:20 --

21       A.    No.

22       Q.    -- on 9/5/05?

23       A.    Nuh-uh.

24       Q.    So that's approximately, I'm just going

25   to say, 12 hours before you saw a doctor?

```
 1   MR. BUCHANAN:
 2            Doctor or nurse?
 3   MS. BROOM:
 4            The nurse.  I apologize.
 5       A.   It's the nurse, yeah.
 6   MS. BROOM:
 7       Q.   And you actually saw the doctor on
 8   9/5/05, but we do not have a time, and that you
 9   arrived at the Memorial Hospital ER on 9/5/05.  It
10   says 1426, so that would be 2:26.  And so you had
11   to see the doctor before 1426, correct?
12       A.   Yes.
13       Q.   So within 12 hours, you saw a nurse and
14   a doctor at the jail, correct, of the alleged
15   assault?
16       A.   And what time are they saying the
17   assault occurred, ma'am, at the jail?
18       Q.   Well, I'm not sure what time the alleged
19   assault occurred, but you arrived at approximately
20   11:00.
21       A.   That's 13, 14, 15 -- that's over 15
22   hours.  The altercation at the jail didn't happen
23   long after I got there.
24       Q.   Okay.  Well, the records are what they
25   are.  We won't dispute over that.  Just for
```

1    argument's sake, we'll assume your 15 hours.  From

2    the time -- did anything change, did your

3    condition get worse within those 15 hours?

4        A.   Yes.

5        Q.   Okay.  How was that?

6        A.   Granulation starts in a wound, and it

7    can embed bacteria and it -- it's not apt to

8    suture as well.

9        Q.   Okay.  And did that occur in your

10   situation?

11       A.   Yes, it did.  As Dr. Dominguez put in

12   here, I'm sure, that he had to debride the wound;

13   in other words, he numbs it and scrubs it to make

14   it a fresh wound.

15       Q.   Right.  But it did eventually -- he did

16   suture it and it did heal, correct?

17       A.   Uh-huh.

18       Q.   And you didn't develop any infection

19   or --

20       A.   No infection, but permanent nerve

21   damage.

22       Q.   Okay.  Are you alleging that because of

23   the alleged delay or --

24       A.   No.

25       Q.   Okay.  Now, when you returned from

1   Memorial Hospital, you were taken to the medical

2   unit, correct --

3        A.    Yes, ma'am.

4        Q.    -- and given your medications, or

5   your Tylenol and Keflex, I believe.

6        A.    Keflex, yes, ma'am.

7        Q.    You were actually given water at that

8   time?

9        A.    I was given a plastic bottle of water.

10  I took the medication with it.  The nurse said,

11  you can keep it.  The cop said, no, you can't keep

12  it.  You can't bring that back on the block.  And

13  I did not -- I don't care what their little

14  computer printout says, I did not have hydration

15  other than that cup of milk the morning after

16  arrest for breakfast and that sip of water to take

17  that medicine with.  The next morning when the

18  nurse came by with my blood pressure medicine, I

19  had to take it dry.

20       Q.    Okay.  Did you hear any comments about

21  Katrina, having problems with water and food and

22  anything like that?  Did you hear any of those

23  concerns at that time?

24       A.    I saw many other people with cups.

25       Q.    Okay.  But you're alleging you did not

1    get a cup, even though the records, as you've seen

2    apparently, say that you received a cup and a

3    spoon?

4         A.    I see a computer generated.

5         Q.    Right.  So are you disputing that you

6    received a cup and a spoon?

7         A.    Absolutely.

8         Q.    Okay.  Now, when you got your breakfast

9    the morning of September 5th, did you eat that

10   meal?

11        A.    Yes, ma'am.  I was fed.

12        Q.    With that, you got the eight-ounce

13   carton of milk, correct?

14        A.    Yes, ma'am.

15        Q.    And you got some water, let's see, water

16   when you returned from the hospital on

17   September 5th, correct?

18        A.    Yes, ma'am.

19        Q.    Now, when were you released?

20        A.    I was thinking it was the 7th, but this

21   says the 6th, but it also says at, what, 6:30 in

22   the evening.  The curfew was in effect then.

23   There's no way I was released when there was a

24   curfew on.

25        Q.    So after this sip of water, you're

1    alleging that you weren't able to get any other

2    water or food after that time, or hydration?

3         A.   No.  Food, I was fed.

4         Q.   But with those meals, isn't it true that

5    they give you some -- a milk --

6         A.   If you have a cup.

7         Q.   With those meals, don't they give you a

8    carton of milk --

9         A.   No.

10        Q.   -- or Kool-Aid?

11        A.   No.  You use your cup, and they bring a

12   container of Kool-Aid in, and you fill it.

13        Q.   Did you tell the officer that you did

14   not have a cup?

15        A.   Many times.

16        Q.   Okay.  And what did they respond?

17        A.   We're trying to get you one.

18        Q.   Could you have used a cup from another

19   inmate?

20        A.   No.  Not with, you know, hepatitis and

21   other things.

22        Q.   So you wouldn't have used a cup?

23        A.   Right.

24        Q.   Now, when you were released from the

25   jail, you sent an e-mail to the sheriff, didn't