# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

GARY BRICE McBAY,
Plaintiff,

VERSUS CIVIL ACTION NO: 1:07cv1205LG-RHW

HARRISON COUNTY, MISSISSIPPI, by and through its Board of Supervisors; HARRISON COUNTY SHERIFF, George Payne, in his official capacity; CORRECTIONS OFFICER MORGAN THOMPSON, acting under color of state law,
Defendants.

DEPOSITION OF REGINA L. RHODES

Taken at the offices of Brown Buchanan, P.A., 796 Vieux Marche' Mall, Suite 1, Biloxi, Mississippi, on Thursday, September 17, 2009, beginning at 2:22 p.m.

APPEARANCES:

PATRICK R. BUCHANAN, ESQUIRE
MARK V. WATTS, ESQUIRE
Brown Buchanan, P.A.
796 Vieux Marche' Mall, Suite 1
Biloxi, Mississippi 39530
ATTORNEYS FOR PLAINTIFF

JOE C. GEWIN, ESQUIRE
Dukes, Dukes, Keating & Faneca, P.A.
2909 13th Street, Sixth Floor
Gulfport, Mississippi 39501
ATTORNEY FOR GEORGE PAYNE, JR.

Center. I'm going to call it the jail just because I don't want to say four words instead of one word, frankly. So when I say "jail," can we understand that I'm referring to the Harrison County --

A. Yes, sir.

Q. -- Detention Center?

All right. When you worked there, are you familiar with the term "brother by a different mother," the phrase?

A. Yes, sir.

Q. What's that mean to you?

A. Well, basically, we shortened it, brother from another mother. It was just to explain the closeness between the folks that worked at the jail.

Q. All right. The correction officers that worked together?

A. Yes, sir.

Q. And y'all were close and relied on each other and depended on each other?

A. Yes, sir.

Q. All right. Have you heard the term "red light, green light"?

A. Yes, sir.

Q. Was that a phrase that was used in booking?

A. Yes, sir, it was.

Q. Tell us what that phrase means to you.

A. Red light would be the facial area, anything that you -- you weren't supposed to hit anything that would show on a booking photo, and green light would be the rest of the body.

Q. All right. And how did y'all come to use red light, green light and determine where you should and shouldn't hit?

A. Well, after Deputy Thompson had a particularly bad booking shot of an inmate named Only, OIC Teel had a impromptu meeting with our shift in the back of booking and inmate records and said that red light, green light -- you know, that the chief was -- the chief, Captain Gaston, was upset about the booking photo and that we needed to be more careful.

Q. All right. Be more careful where you hit people?

A. Yes, sir.

Q. Okay. So it's okay to hit folks just as long as it didn't show up on the booking photo?

MR. GEWIN:

Object to leading.

MS. YOUNG:

Object to the form.

MR. BUCHANAN:

Q. Subject to the objection, did you hear my question?

A. Yes, sir, I did.

Q. Okay. So it was okay to hit people as long as it didn't show up on the booking photo?

A. Yes, sir.

Q. People in booking, I mean, there are different legal terms for them, inmates, detainees and all of that. I'm going to call them inmates just for sake of ease again, not necessarily subscribing any legal terms or get you to give me legal opinions on the different rights owed to an inmate versus a detainee and all of that. Okay? Was it common, in your experience when you were there, for inmates that were brought in there to be taunted by the correction officers?

A. Yes, sir.

Q. Tell us about that.

A. If the inmate came in and was either running their mouth or, you know, belligerent in any way, you know, even if they weren't sometimes,

the officers would start picking on them, taunting them, you know, if -- in particular, if somebody was looking at you, you know, looking at you hard, you know, you might say if you're feeling froggy jump or, you know, you're looking at me like you want to hit me, go ahead, stuff to that effect.

Q. Did you hear Officer Teel ever taunt inmates?

A. Yes, sir.

Q. Did you hear Officer Thompson ever taunt inmates?

A. Yes, sir.

Q. Did you hear Officer Wills ever taunt inmates?

A. Yes, sir.

Q. How about Officer Stolze, did he ever taunt the inmates?

A. Yes, sir.

Q. And Officer Thompson has pled guilty to charges arising out of his employment there at the jail and is serving time?

A. Yes, sir.

Q. All right. And the same with Officer Stolze?

A. Yes, sir.

Q. And Officer Priest?
A. Yes, sir.
Q. And Officer Wills?
A. Yes, sir.
Q. All right. Folks that would come in who had been drinking, were they more apt to be taunted by these officers?
A. To me, I would say they appeared to be.
Q. And why is that?
A. They were easier targets.
Q. Give me one minute real quick. Let me jump -- and I hate to jump around on you, but I need to ask a couple of questions before I ask some other questions. So let me go back to Exhibit 1. On Page 3 of Exhibit 1, it says that, While she, being you, were assigned to the booking area, you observed Teel and other corrections officers engage in a pattern of physical abuse of inmates at the jail. Is that a true statement?
A. Yes, sir.
Q. All right. More specifically, Teel and other correction officers routinely participated in striking, punching, kicking, choking and otherwise assaulting inmates in circumstances that did not justify the use of force. Is that a true

statement?

A. Yes, sir, it is.

Q. Those things, that pattern, that practice of abuse, did that happen -- I mean, did it happen just on one day during the time you were there or did it happen for a long period of time while you were employed there?

A. It was almost daily while I was employed there.

Q. All right. It said, Teel regularly encouraged other correction officers regarding their involvement in this conduct. Is that a true statement?

A. Yes, sir, it is.

Q. Meaning he did things and he got the other officers involved in the things -- the assault on the inmates?

A. Yes, sir.

Q. All right. Additionally, Teel and other correction officers submitted false, incomplete, and misleading jail reports for the purpose of covering up these assaults. Is that a true statement?

A. Yes, sir.

Q. All right. And it says you were aware

that Teel and other correction officers were submitting false and incomplete and misleading reports to cover up the uses of unnecessary force and failed to report their criminal conduct. Is that a true statement?

A. Yes, sir, it is.

Q. All right. Those things that I just read in that paragraph, do those things apply to Officer Stolze?

A. Yes, sir.

Q. Do they apply to Officer Priest?

A. Yes, sir.

Q. Do they apply to Officer Teel?

A. Yes, sir.

Q. Do they apply to Morgan Thompson, Officer Thompson?

A. Yes, sir.

Q. All right. Were you there on the night the incident happened with Jessie Lee Williams?

A. Yes, sir, I was.

Q. Before Mr. Williams was beaten to death, was he taunted by the booking officers?

A. Yes, sir, he was.

Q. Did Mr. Williams make any comments or say anything to the booking officers either before

or when they were taunting him?

MR. BRENDEL:

Object to the form. When you're talking about booking officers, I want to make sure we know which booking officers we're talking about.

MR. BUCHANAN:

Q. Do you recall who was on duty that night?

A. Yes, sir.

Q. Who was on duty that night?

A. Myself, OIC Teel, and Thompson.

Q. Morgan Thompson --

A. Yes, sir.

Q. -- and Officer Teel? All right. And did Officer Teel and Officer Thompson taunt Mr. Williams?

A. Yes, sir.

Q. Did he say anything to Officer Teel or Officer Thompson before or when they were taunting him?

A. While he was handcuffed he said he was going to beat Teel's ass.

Q. But he was handcuffed when he said that?

A. Yes, sir.

Q. And then after Mr. Williams was beat,

the nurse was called, right?

A. Yes, sir.

Q. And the nurse looked at him, said he had a cut lip, cut ear and his eyes were puffy?

A. Yes, sir.

Q. And she also said, I believe, that he didn't need to go to -- he didn't need to go out for AMR?

A. Yes, sir.

Q. All right. She said that he was going to live and be okay?

A. Yes, sir.

Q. And I asked you this, and it's in your pleas. So the booking officers would falsify their reports; is that right?

A. Yes, sir.

MR. GEWIN:

Object to the form.

MR. BRENDEL:

Object to the form, time.

MR. BUCHANAN:

Q. I'm trying to look for a page discreetly, and I'm not having that much luck, so I apologize. So I'll just tell you that I'm taking an extra minute here because I can't find

the page that I was looking for. There we go.

The objection was time. Would it be fair to say that from when you started in May of 2004 until when you left in April of 2006, the corrections officers would falsify reports?

A. Yes, sir.

MR. BRENDEL:

Object to the form, not specifying the correction officers' names.

MR. BUCHANAN:

Q. You and I have already talked about the names of correction officers who falsified reports, haven't we?

A. Yes, sir.

Q. Thank you.

(Exhibit 2 was marked.)

MR. BUCHANAN:

Q. Exhibit 2 is the Uniform Booking/Arrest Form for William David Seal, and I want to talk to you about that in terms of you weren't on duty when Mr. Seal was booked into the jail. And let me ask you this: You're aware that there are cameras in the jail, right --

A. Yes, sir.

Q. -- showing different areas of the

language you've seen in falsified reports?

A. Yes, sir, it is.

Q. On the one, two, three, fourth paragraph on the next page it said, Captain Steve Campbell and Investigator Werby viewed the digital recording of the booking procedure. The video clearly showed Seal moving his left hand from the booking desk and attempting to strike booking deputy Morgan Thompson. Deputy Thomas Wills used a brachial plexus stun on Seal, and several deputies restrained Seal on the ground and cuffed him while he was on the ground. Is that language consistent with language you've seen in falsified reports?

A. Yes, sir.

Q. And, in fact, the brachial plexus stun, isn't it true that correction officers were instructed if they hit somebody or used force that they shouldn't use, to write it down as an open-hand stun versus the force that was used?

A. Yes.

MR. GEWIN:

Object to the leading.

MR. BUCHANAN:

Q. Did Officer Morgan Thompson submit