## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM DAVID SEAL** | § | **PLAINTIFF** |
| | § | |
| **V.** | § | **CAUSE NO. 1:08cv175-LG-RHW** |
| | § | |
| **HARRISON COUNTY, MISSISSIPPI, BY** | § | |
| **AND THROUGH ITS BOARD OF** | § | |
| **SUPERVISORS; HARRISON COUNTY** | § | |
| **SHERIFF GEORGE PAYNE, IN HIS** | § | |
| **OFFICIAL CAPACITY; CORRECTIONS** | § | |
| **OFFICER THOMAS PRESTON WILLS,** | § | |
| **ACTING UNDER COLOR OF STATE** | § | |
| **LAW; and CORRECTIONS OFFICER** | § | |
| **MORGAN THOMPSON, ACTING UNDER** | § | |
| **COLOR OF STATE LAW** | § | **DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PAYNE'S MOTION FOR SUMMARY JUDGMENT AND DENYING HIS MOTION TO SUBSTITUTE EXHIBIT AND SECOND MOTION TO STRIKE

BEFORE THE COURT are Defendant Harrison County Sheriff George Payne's Motion

for Summary Judgment [252], Motion to Substitute Exhibit [260], and Motion to Strike

Plaintiff's Evidentiary Exhibits Submitted in Support of Response to Defendant's Motion for

Summary Judgment [301]. Plaintiff William David Seal brought this action for the alleged abuse

he received while in the custody of the Harrison County Adult Detention Center ("HCADC").

Payne argues (1) there is no evidence of a constitutional violation (2) nor a policy, (3) which was

the moving force behind the violation; (4) Seal fails to state a Section 1985 claim; (5) there was

no conspiracy; (6) he has not lost a civil action; and (7) Payne is not liable for Section 1983

punitive damages. He further argues that Seal's Exhibits C-E and I-K are inadmissible on

summary judgment because they are (8) unsworn, (9) unauthenticated, (10) hearsay, (11)

character evidence, (12) irrelevant, (13) untrustworthy, (14) unduly prejudicial, (15) subsequent

remedial measures, (16) "back door" expert opinion, and (17) not based on personal knowledge. The Court has considered the parties' submissions[1] and the relevant legal authority. Summary Judgment is granted on the Section 1983 conspiracy to deny access to courts and punitive damages claims. The Section 1985 claims are dismissed without prejudice. The remainder is denied.

## FACTS AND PROCEDURAL HISTORY

On September 4, 2005, Seal was arrested by the Gulfport Police Department. As a result of the force used in that arrest, he sustained a laceration. He was taken to the HCADC. While being booked, he repeatedly asked for medical attention for his injury. Defendant Thomas Preston Wills responded that he would pour some alcohol on it. Seal protested. Wills, Defendant Morgan Thompson, and other officers then took Seal to the ground, handcuffed him, and placed him in a cell. Later, a jail nurse examined his injuries and told officers that he needed to go to the Emergency Room. He was not sent. Later the jail doctor examined Seal and again told officers that he needed to go to the hospital. He was then taken to the hospital.

Seal subsequently filed this lawsuit. He brings claims against Payne under Sections 1983 and 1985 for excessive force, denial and delay of medical care, denial of water, covering up the alleged abuse, and conspiracies to use excessive force and to cover up the alleged abuse.

## DISCUSSION

MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment shall be granted "if the pleadings, depositions, answers

---

[1]Payne filed excess pages over and above that for which he was granted leave. Therefore, the Court did not consider those excess pages.

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. To make this determination, the Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit. Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). A "material fact" is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The party that bears the burden of proof at trial also bears the burden of proof at the summary judgment stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986). "[W]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon . . . mere allegations or denials . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

I.      SECTION 1983

Payne seeks summary judgment on the excessive force, failure to train and supervise, denial and delay of medical care, and conspiracy claims under Section 1983.

A claim against the sheriff in his official capacity is treated as a claim against the county, and sheriffs in Mississippi are the final policymakers with respect to all law enforcement decisions made within their counties. *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir. 1996). A municipality may be held liable under 42 U.S.C. 1983 when its official policies or customs violate the Constitution. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). The policy or custom must cause the constitutional tort. *Id.* at 691. "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Thus, to prove Payne is liable, in

his official capacity, under Section 1983, Seal must prove (1) the existence of a policymaker, and (2) an official policy or custom, (3) which is the moving force behind a constitutional violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

### A.     EXCESSIVE FORCE

Payne first challenges the excessive force claim, arguing there was no excessive force.  In the alternative, he argues there was neither a policy of excessive force nor was it a moving force behind the violation.

#### 1.     CONSTITUTIONAL VIOLATION

The Due Process Clause, applicable to the States via the Fourteenth Amendment, protects a pretrial detainee from excessive force that amounts to punishment.  *Graham v. Connor*, 490 U.S. 386, 395 n.11 (1989).  The standard for analyzing an excessive force claim under the Fourteenth Amendment is the same as the Eighth Amendment standard.  *Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993).  This right is violated if there is (1) more than a de minimis injury, (2) which resulted directly and only from the use of force that was excessive to the need, and (3) the force was objectively unreasonable.  *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).  To determine whether the force was excessive, the inquiry is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm."  *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993). "Often, of course, there will be no evidence of the detention facility official's subjective intent, and the trier of fact must base its determination on objective factors suggestive of intent."  *Id.* Some of these factors would be (1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between the need and the amount of force used, (4) the

-4-

threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of the forceful response.  *Id.* at 1447 n.29.

Payne argues there was no excessive force because (1) the deputies did not act with malice, and (2) the "objective" evidence shows Seal's left eyebrow laceration and permanent nerve damage were not caused by the force.  Payne argues that the deputies did not act with malice because Seal's arms were flailing, he was belligerent, and he had struck Thompson.  There is a dispute of fact as to whether any of this occurred.  Seal testified:

> Q.     Okay.  So you're just asking them to attend to the wounds that were bleeding, correct?
>
> A.     Right.  Had bled.
>
> Q.     Had bled, I'm sorry.  Now, you were ordered to go and stand and put your hands on the counter, the booking counter at the jail, weren't you?
>
> A.     Yes, ma'am.
>
> Q.     But you didn't; you started flailing around?
>
> A.     No, ma'am.
>
> Q.     Okay.  What did you do when they ordered you to put your hands on the counter?
>
> A.     Put my hands on the counter.
>
> Q.     And then what happened next?
>
> A.     They . . . stretched me just as far as possible.  They had released the cuffs.  They told me to stand back against the wall.  I was standing there.  That's when I demanded medical treatment again.  They didn't want to do it.  I demanded medical treatment again.  They didn't want to do it.
>
> . . .
>
> A.     They refused.  They told me to stand back against the wall.  I stood back against the wall.  Wills . . . said, well, we'll just get some peroxide or

some alcohol and pour it on your little wound. I said, no, you will not do such a thing because you're not going to pour a caustic substance in a fresh wound and make the wound worse.

Q.     Okay. If I can stop you there. So Officer Wills did offer–

A.     No.

Q.     –to give you some medical treatment?

A.     That was a smart aleck response, in my opinion.
. . .

A.     As I recall, Wills and I kind of went back and forth.

MS. BROOM:

Q.     Verbally?

A.     Verbally.

Q.     Okay. Where were you standing at that moment?

A.     Back against that wall.
. . .

Q.     What was said during this argument; do you know?

A.     Kind of debating over him saying that he was going to put alcohol and peroxide on the wound and him continuing it, and I said no, you're not. And I told him . . . again that I wanted to see the nurse for treatment. And I can't remember exactly which, but there were curse words exchanged between–

Q.     So you're admitting that you were using profane language against Wills?

A.     I admit that, and I admit that he was, also. And he said, M[*]th[*]rf[*]ck[*]r, just wait a minute.

       Okay. So whatever he was doing, got through. They came around the side of booking, and I remember Thompson grabbing me, along with . . . Wills. Those are the only two I can really remember–I know there was others there–and slamming me to the ground and slamming my eyebrow into the pavement. I

swear to God I remember that. And I remember Thompson putting my head into a choke hold, Wills grabbing my thumb, and I do remember passing out. I remember coming to, and one of the corrections officers said, put the cuffs on just as tight as you can. And then they put me back up against the wall, and I was sitting there.

(Pl.'s Dep. at 83-89). Seal explained that the officers were behind the booking desk, which is protected by a cage, and he was on the opposite side of the cage, standing against the wall across from it during the argument with Wills. He told Seal, among other things, "the power is down and there's no cameras." *Id.* at 162. According to Wills, the jail was on generator power at the time, because this was just six days after Hurricane Katrina. Seal testified that the officers then rushed at him from out around the booking cage. Then, because he could tell they were about to assault him, he took two steps forward and put his hands up in the air.

Notably, Thompson never claimed that Seal struck him. In fact, Thompson testified that he did not remember Seal doing that. Rather, Thompson said that he:

later saw on the tape, that [Seal's] arm came up. The tape was real sketchy, so you can't exactly see what movements he's making. But his arm came up, and Wills had hit him, gave him a strike, pushed him, done something to send him into me on accident. That's when we took him to the floor.

(Thompson Dep., 11:06-11:35 a.m., at 10). Further, Wills's account of the incident, found in the Internal Affairs report, did not include an accusation that Seals struck Thompson. Rather, this was a justification cited by Internal Affairs, as its interpretation of the surveillance video, which Payne has not produced in this litigation, nor would he produce it when Seal asked to see it prior to litigation. (Pl.'s Mot. for Sanctions Ex. H).

This is evidence from which a reasonable jury could conclude that Seal was neither flailing his arms, being belligerent, nor did he strike Thompson. Rather, a jury could conclude

-7-

that he was taken down for repeatedly asking for medical attention. Therefore, Payne is not entitled to summary judgment on whether the deputies acted with malice.

As for Seal's injuries, Payne only challenges two of the multiple injuries Seal claims were caused by the use of force. Second, Payne acknowledges there is a dispute of fact as to the causation of the two injuries he does challenge. Rather, he asks the Court to pass on the credibility of his causation evidence over Seal's. For these reasons, Payne has not demonstrated that he is entitled to summary judgment on this issue.

2.     POLICY OR CUSTOM

Having found a question of fact regarding whether there was excessive force, the Court now considers whether there was an excessive force policy. "Official policy is ordinarily contained in duly promulgated policy statements, ordinances, or regulations." *Piotrowski*, 237 F.3d at 579. Where the policy is facially constitutional, the plaintiff must prove that "it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Id.* (quoting *Bd. of the Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997)). A custom is a "persistent, widespread practice of [government] officials or employees, which, although not officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579. "Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). The Fifth Circuit held:

> Constructive knowledge may be attributed to the governing body on the ground

-8-

that it would have known of the violations if it had properly exercised its
responsibilities, as for example, where the violations were so persistent and
widespread that they were the subject of prolonged public discussion or of a high
degree of publicity.

*Id.* at 842. "[T]he sheer numerosity of incidents can provide evidence of constructive
knowledge." *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

Seal argues that there was a long-term, widespread custom of using excessive force on
pre-trial detainees and other inmates at the HCADC. He presents evidence of hundreds of
instances of excessive force at the HCADC from 2004 to 2006. He presents evidence that the
Sheriff and the Board of Supervisors were warned of this widespread abuse several times before
Seal's incident on September 4, 2005.

For example, Wills, Thompson, and former Sergeant Dedri Caldwell each admitted to
using unjustified force on over one hundred inmates while they worked at the jail and to
witnessing over one hundred additional unjustified assaults committed by other deputies. They
further admitted that they and other deputies engaged in a conspiracy to deprive persons of their
right to be free from excessive force. According to Caldwell, the conspiracy began in 2001.
According to Thompson, it ended in September 2006. Likewise, former deputies Regina Rhodes,
Daniel Evans, Karl Stolze, and William Priest admitted to personally participating in several
instances of excessive force, to witnessing additional instances, and to participating in the same
conspiracy.

Rhodes testified that it was common for the corrections officers to taunt the inmates who
were brought into the booking room. She heard Stolze, Officer in Charge Ryan Teel, Thompson,
and Wills engage in this taunting. Intoxicated inmates were more likely to be taunted because

"[t]hey were easier targets." (Rhodes Dep. at 13). She observed a pattern of abusing inmates that included "striking, punching, kicking, choking and otherwise assaulting inmates in circumstances that did not justify the use of force." *Id.* at 13-14. She said this excessive force occurred "almost daily while I was employed there," "from May 2004 to February 2006." *Id.* at 14; (Rhodes Plea Agreement at 3). She testified that Teel often encouraged the corrections officers to use excessive force and to get involved in instances of excessive force.

Timothy Brandon Moore worked at the jail from 2002 to 2005. He testified that booking officers were mistreating people at the jail. There was a meeting on April 20, 2005, with the booking staff. The purpose of the meeting "was basically to blast booking. It was aimed at the excessive force being used." (Moore Test. at 548-49). Despite this meeting, there was no change in booking. It was a daily practice to prepare false reports to cover up excessive force. The booking officers had discussions about the video cameras in booking and how to avoid detection of excessive force. "Captain Gaston said several times, if you have to do anything, do it off camera, in the shower or in the hallway. . . . The cameras were our enemy." *Id.* at 555. The booking officers had theme nights for different days of the week. These included, "Thump a Thug Thursday, Fight Night Friday, Slap a Ho Saturday." *Id.* at 556. They were told to "kick[] ass and not tak[e] names," which meant "we were using excessive force and not writing reports." *Id.* According to Moore the booking officers felt it was funny to use excessive force, and they would laugh and egg on each other. Whenever a female officer had a female detainee in the shower for the dress out procedure, Teel would lead the booking officers in a chant of, "Spray the bitch," to encourage the female officer to use OC spray on the detainee. *Id.* at 567. When he led these chants, he would not be able to see if any force was needed. If the female officer did not

spray the detainee, the officer "[w]ould be known as an inmate lover." *Id.*

Priest testified, whenever a detainee was being loud, the officers were instructed by Captain Gaston to get the detainee quiet by whatever means necessary.

> A.     Again, sometimes you could talk a person out of it. Other times, we may have to get a little physical and restrain them to the bench using the leg restraints.
>
> . . .
>
> A.     There's several incidents. Picking individuals up and throwing them on the bench, drag them to the floor, things of that nature.
>
> Q.     And at the time that this force was used, what was the person doing?
>
> A.     Probably just a whole lot of talking, belligerent actions.

(Priest Test. at 403). The booking officers were instructed, "If an individual had gotten on our nerves, was continuing to become a problem, maybe we need to teach that guy a lesson." *Id.* at 408. Several times Priest witnessed booking officers choke people until they passed out. The officers would sometimes spray the toilet seats and benches with OC spray. They then would laugh when an inmate would become contaminated with the spray. The booking officers would have multiple conversations about using excessive force and how to make it look like it was the inmate's fault. "Jokingly, if somebody was being abused. It was sort of the thing to say, 'Stop resisting,' whether they were or were not." *Id.* at 435. Priest likewise testified that the officers joked about and encouraged each other to use excessive force. He, too, testified it was a practice to yell, "Spray the bitch," every time a female officer was dressing out a female detainee. If the officer did not, the others "[m]ight jokingly call her an inmate lover." *Id.* at 436.

> A.     If you didn't take action against an individual inmate, then you may be labeled as inmate lover, somebody that is sympathetic towards inmates.

Q.      What did it mean to be labeled an inmate lover?

A.      Well, you're either with the group or you're not with the group.

*Id.*

Priest testified that, on October 4, 2005, detainee Only Al-Khidhr was brought in the booking room.  Priest was not present, but he was briefed about Al-Khidhr when Priest came in on the next shift.  He saw the booking photo, which showed "a brutal mess.  He was beat up pretty bad."  *Id.* at 417.  Thompson admitted to Priest that he had beat up Al-Khidhr.  Thompson posted at least six copies of the booking photo all over booking.  When Priest took some down, he "was kind of warned away by Thompson telling me don't take them down.  Leave them up." *Id.* at 418.  The rest remained up at least throughout the day.

Rhodes testified that red light/green light was a phrase used in booking:

A.      Red light would be the facial area . . . you weren't supposed to hit anything that would show on a booking photo, and green light would be the rest of the body.

Q.      All right.  And how did y'all come to use red light, green light and determine where you should and shouldn't hit?

A.      Well, after Deputy Thompson had a particularly bad booking shot of an inmate named Only, OIC Teel had a impromptu meeting with our shift in the back of booking and inmate records and said that red light, green light–you know, that the chief was–the chief, Captain Gaston, was upset about the booking photo and that we needed to be more careful.

Q.      All right.  Be more careful where you hit people?

A.      Yes, sir.
. . .

Q.      Okay.  So it was okay to hit people as long as it didn't show up on the booking photo?

A.      Yes, sir.

(Rhodes Dep. at 10-11).  Her testimony indicates the red light green light practice was instituted

shortly after Seal's arrival at the jail and was in response to allegations that Thompson had struck

another inmate in such a way as to show up on the booking photo.  Priest likewise testified that

this practice was known to him.  After Priest had hit a detainee in the mouth, Priest was chastised

by Stolze:

> A.      He wasn't concerned about the inmate.  He was concerned about what I
> had done.
>
> Q.      Why was he concerned about what you had done?
>
> A.      He relayed to me that sort of phrase that we would use, red light/green
> light.  Red light meaning you don't hit to a part of the body that you can
> visibly see a mark.  Green light meaning you can hit an individual where it
> cannot normally be seen on the body, things of that nature.

(Priest Test. at 424).  This was a phrase with which Priest was already familiar.

There is evidence that, as early as February of 2005, Sheriff Payne was actually notified

by the United States Department of Justice of its finding of 31 instances of force in a one month

period from November 2004 to December 2004, which represented both a "serious increase in

the use of force" as well as "a very disturbing pattern of misuse of force."  (Pl.'s Resp. Ex. D at

3); (Pl.'s Resp. Ex. E at 3).  When asked whether or not he should have known of the custom of

excessive force, Sheriff Payne first testified, yes.  As he points out, he then denied this, but that is

a credibility question for the jury.

Taken together, this and other evidence permit a reasonable jury to find that there was a

custom of excessive force that was sufficiently widespread and persistent to constitute an official

policy.  The evidence that there were hundreds of instances of excessive force, and almost daily

occurrences for over one year prior to September 4, 2005, is sufficient to show that Sheriff Payne had at least constructive knowledge. He admitted that he should have known and admitted that he was on notice for seven months prior to the subject incident. Less than one month after Seal's alleged assault, Thompson allegedly was engaged in another beating which again did not result in discipline but in further instruction of how to hide excessive force. It is undisputed that even members of the Board of Supervisors for the County, who were further removed from the jail than Sheriff Payne, were on notice of the alleged culture of violence at the jail.

### 3. MOVING FORCE

The Court next considers whether there is evidence that the alleged policy of excessive force was the moving force behind the alleged excessive force against Seal. After due consideration of the above evidence, the Court must answer this question in the affirmative. There is evidence that Seal, too, was taken down and choked until he passed out for being loud.

### B. FAILURE TO TRAIN AND SUPERVISE

Although the First Amended Complaint alleges a failure of the Sheriff, in his official capacity, to properly train and supervise, this allegation appears to be a part of the excessive force claim and not alleged as a separate claim. This issue is moot.

### C. DENIAL/DELAY OF MEDICAL CARE

Payne argues there is no evidence that any Harrison County officer was deliberately indifferent to Seal's medical care needs and he was not injured as a result of the delay. Seal makes both a claim of denial and of delay of medical care against Payne.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "This

is true whether the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care." *Id.* at 104-05. The "plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Tex. Dep't of Crim. J.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). "The mere delay of medical care can . . . constitute a . . . violation but only 'if there has been deliberate indifference [that] results in substantial harm.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "Deliberate indifference . . . occurs only where a prison official subjectively knows of and disregards a substantial risk to the inmate's health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The "official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Easter*, 467 F.3d at 463. In addition, Section 1983 requires a showing of proximate causation, which is evaluated under the common law standard. *Murray v. Earle*, 405 F.3d 278, 290 (5th Cir. 2005).

For example, in *Easter*, the plaintiff alleged that "Powell refused to provide any treatment to, and ignored complaints of, a patient suffering from severe chest pain that she knew had a history of cardiac problems. Powell's alleged conduct meets the 'deliberate indifference' threshold." *Easter*, 467 F.3d at 464. In this situation, it was inferrable that Powell knew of the substantial risk of harm. *Id.* at 463. The court further noted that Easter's separate delayed treatment claim failed, because he did not allege that it resulted in serious harm. *Id.* at 464. However, he "clearly stated" a violation regarding his refusal to treat claim for the "severe chest pain he suffered during the period of time Powell refused to treat him." *Id.* at 464-65.

Payne's reason for lack of deliberate indifference is that Seal was eventually seen by a nurse and a doctor. There is evidence that Seal was bleeding from his face and that he repeatedly asked to see a nurse for medical treatment. According to him, deputies first sarcastically told him they would pour alcohol on it, cursed at him, and then tackled him. Finally, Seal testified:

> I know a nurse, after my beating, did come to booking, did dress it, did tell the cops, correction officers he needs to go out, which is their lingo for needs to go to Memorial [Hospital], he needs stitches. They said, no transports available. So they refused me medical care, absolutely refused me proper medical care.

(Pl.'s Dep. at 102). This is evidence from which a reasonable jury could find that HCADC officials were deliberately indifferent to Seal's medical needs. Despite the fact that the nurse told them that he needed to go to the Emergency Room for stitches, the booking room deputies did not provide him transportation. Payne argues that it is because no transportation was available. He points to his affidavit, wherein he states, "At the time of Plaintiff's arrest and incarceration on September 4, 2005, the Harrison County Sheriff's Department and Harrison County Adult Detention Center were still operating under a 'State of Emergency,' and all available vehicles were being utilized towards this effort." (Payne Aff. at 3 (¶8)). However, he also states:

> I was not present during any of the alleged events in the Plaintiff's Complaint. Furthermore, I was never present at any locations where he may have been at any time.
>
> I had no involvement in, or knowledge whatsoever of, any events or incidents of September 4, 2005, involving Plaintiff which occurred in the booking area of the Harrison County Adult Detention Center, until after the alleged incident had already concluded.

*Id.* at 2-3 (¶¶5-6). Indeed, when the jail doctor later ordered Seal be transported to the Emergency Room, Harrison County deputies provided the transportation. When asked to describe the post-Katrina conditions at the jail, Thompson makes no mention of the lack of

-16-

transportation.  Therefore, assuming that lack of transportation could excuse a delay in medical treatment, there is a dispute of fact as to whether or not there was such a lack of transportation.

Payne alternatively argues that Seal was not damaged because of the delay of medical treatment.  There is evidence that because of the delay, it was too late to suture the eyebrow laceration.  Therefore, the Emergency Room doctor had to scrub the wound to reopen it, so it could be sutured.  Payne does not address this evidence or argue why it is or is not sufficient to show damage as a result of the delay in medical treatment.

> D.      DENIAL OF HYDRATION

Payne next argues that Seal was not denied hydration because he was given an eight ounce carton of milk, a sip of water, and running water in his cell.  Payne also argues Seal suffered no injury as a result.

"The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999).  The constitutional prohibition against cruel and unusual punishment requires that prisoners be afforded humane conditions of confinement, receive adequate food, shelter, clothing, and medical care.  *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001).  To establish a constitutional violation due to conditions of confinement, an inmate must show (1) that prison officials deprived him of "the minimal civilized measure of life's necessities;" and (2) that the prison officials acted out of indifference to the inmate's health or safety.  *Id.*  In deciding the constitutionality of conditions of confinement of pretrial detainees, the Court must determine whether the conditions  complained

-17-

of are imposed for the purpose of punishment. *Bell v. Wolfish*, 441 U.S. 520, 538-539 (1979).

Seal was brought into the HCADC at about 11:00 p.m. on the night of September 4. The next morning, with breakfast, he was given an eight ounce carton of milk to drink. Later that afternoon, sometime after 2:30 p.m., he was given a sip of water with which to take medicine. He states that this was all of the hydration with which he was provided. "The next morning [September 6] when the nurse came by with my blood pressure medicine, I had to take it dry." (Pl.'s Dep. at 106). Other inmates, on the other hand, were given cups, which prison officials would fill with Kool Aid. Thus, there is a dispute of fact as to whether Seal had access to running water or only had one serving of milk and a sip of water in a forty-three and a half hour period.

### E.    CONSPIRACY

Seal asserts Section 1983 claims against Payne for the alleged conspiracies to use excessive force and to cover it up. Payne challenges the first conspiracy claim, arguing that Seal admitted that he had no independent knowledge of the conspiracy. He responds that there is evidence of these conspiracies and of the resulting excessive force.

Payne has failed to demonstrate that he is entitled to summary judgment on the first conspiracy claim, because he does not argue that there is a lack of genuine issue of material fact on this point.

Moreover, there is evidence of such a conspiracy. "A conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act." *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995). To prove a conspiracy claim under Section 1983, the plaintiff must prove (1) a conspiracy

involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy, by a party to the conspiracy. *Pfannistel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990). As discussed previously, Harrison County deputies admitted there was a conspiracy under color of law to use excessive force upon inmates in the booking room. It began as late as 2004 and ended as late as September, 2006. The above described evidence indicates that Seal was subjected to excessive force as a result of this conspiracy.

Payne argues the second conspiracy claim fails because Seal is presently bringing a civil action for the alleged excessive force. He responds that there is a genuine issue of material fact as to whether the conspiracy to cover up existed and whether there was a cover up of the alleged violations.

This particular conspiracy claim alleges a conspiracy to deny Seal's access to courts. To pursue this claim, he must prove that the conspiracy "hindered his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). It is not clear if he is pleading a "forward-looking" or "backward-looking" access claim. A forward-looking access claim is a case where the "litigating opportunity yet to be gained" is being blocked by the defendants. *Christopher v. Harbury*, 536 U.S. 403, 414 (2002). "The object . . . is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* at 413. He cannot prove a forward-looking denial of access, because he has in fact filed the excessive force claim.

A backward-looking claim is about "an opportunity already lost." *Id.* at 414-15. It looks "backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.* at 414. For a "backward-looking

access claim," Seal must prove (1) an underlying cause of action, (2) the litigation of which was frustrated by official acts, (3) which resulted in a lost remedy. *Id.* at 415-16. As for the third element, he:

> must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element.

*Id.* at 415. For example, the official deception "may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." *Id.* at 414.

On the record as it presently stands, the Court finds no evidence that Seal has lost a remedy for his excessive force claim. There has yet been no loss nor "inadequate settlement." The Court is provided with no evidence of a lost opportunity to sue Wills, Thompson or others, or the lost opportunity to seek some particular relief. Therefore, Payne is entitled to dismissal of the Section 1983 conspiracy to deny access to the courts.

### F. PUNITIVE DAMAGES

Payne seeks dismissal of Seal's punitive damages claim under Section 1983. He does not respond to this argument.

Punitive damages are not recoverable on Section 1983 claims against a municipality. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Since the Sheriff, in his official capacity, is the County, Section 1983 punitive damages are not recoverable against him in his official capacity either. Payne is entitled to summary judgment on the Section 1983 punitive damages claim.

-20-

## II. SECTION 1985

Payne argues that Seal has failed to state a claim under Section 1985, because the First Amended Complaint does not describe any of the conduct proscribed by that statute. Seal responds that there is a genuine issue of fact as to whether there was a conspiracy to use excessive force and to cover up the excessive force. For the reasons stated in the Court's contemporaneous Order Granting Wills and Thompson's Motions to Dismiss, the Court finds that the First Amended Complaint fails to state a claim under Section 1985. The Section 1985 claims are dismissed without prejudice.

## MOTION TO STRIKE

Payne argues that Seal's Exhibits C-E and I-K are inadmissible on summary judgment.

## I. EXHIBIT C

Seal's Exhibit C is the Plea Agreements and two Judgments in the criminal cases in which several booking room deputies admitted to excessive force.

First, Payne argues that the Plea Agreements and Judgments are not sworn to nor certified. These documents are court records that were filed in criminal cases presided over by the undersigned. Most of the documents are available to the public through the CM/ECF system. The plea agreements are each signed by several persons, and the judgments are signed and entered by the undersigned. The Court has compared the documents in Exhibit C with those filed in their respective cases in the CM/ECF system and finds that they are authentic. *See United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) (holding that a document may be authenticated with circumstantial evidence, including the document's own distinctive characteristics). The Court further notes that, in each respective criminal case, the plea

agreement and its basis was sworn to, in open court, before the undersigned.

Payne secondly argues that the plea agreements are hearsay. As this Court has previously ruled, these pleas are public records that fall within the public records and reports exception. Fed. R. Evid. 803(8). Moreover, they are statements against interest. Fed. R. Evid. 804(3).

Payne next argues that Wills and Thompson's plea agreements are character evidence used to prove that they conspired to and did use excessive force on Seal. Payne does not explain why he has standing to raise this argument. In any event, the Court did not rely on Wills and Thompson's plea agreements to prove that they used excessive force on Seal. To the extent the Court relied on Wills and Thompson's plea agreements as evidence they conspired between 2004 and 2006 to use excessive force upon inmates, that is not character evidence. They pled to the very conspiracy at issue in this case. Their plea does not show they had a tendency to conspire from 2004 to 2006 because they had conspired at some time before 2004. The conspiracy is stated by them to have begun in 2004 and ended in 2006. That is the conspiracy upon which the Court relied.

Payne next argues that Exhibit C is irrelevant as to whether he should have had constructive knowledge, because (1) the events contained in the pleas are subsequent to Seal's alleged beating, (2) the pleas and judgments are subsequent to Seal's alleged beating, (3) they are "vague and non-specific," and (3) Payne did not have actual knowledge. (Payne's 2d Mot. to Strike at 7). On the contrary the pleas describe conduct prior to Seal's incident. Specifically, the conduct occurred from as early as 2001 until 2006. The Court does not find the pleas vague and non-specific. Whether they are is a credibility question for the jury. Payne admits that his knowledge is in issue; thus, whether or not he had constructive knowledge is relevant to this

case.

Payne argues the pleas and Judgments are untrustworthy because the pleas were negotiated and Thompson recanted portions of his plea in his deposition.  Credibility is not for the Court to decide on summary judgment.  This argument attacks the weight and not the admissibility of the evidence.

Finally, Payne argues that the evidence is prejudicial because it is an attempt to inflame the jury with evidence of the beating death of Jessie Lee Williams.  First, Payne invoked the Williams incident in his Motion for Summary Judgment, so this argument is waived.  Second, there is no jury, as this was evidence submitted on a motion for summary judgment, so this argument has no merit.  Finally, the Court did not consider the Williams incident, so this argument is moot.

## II.      EXHIBITS D AND E

Exhibit D is the February 2005 report from Steve Martin of the Department of Justice. Exhibit E is a July 2005 transmittal letter which purports to send the report to Sheriff Payne.  He first objects and argues that both are inadmissible because they are not sworn nor authenticated. Payne admitted he received this report in his deposition.  He referenced the report and transmittal letter in his affidavit he submitted on summary judgment.  In fact, Payne provided this very letter with his affidavit on summary judgment.  Therefore, he has admitted the authenticity of the letter, despite the fact that he has repeatedly denied its authenticity in this and other cases before this Court.  He then sought to retract all but the cover page of this letter by motion at docket number [260], in an attempt to maintain this objection to authenticity.  The Court hereby denies the Motion to Substitute Exhibit [260] and overrules this objection to these exhibits.

Payne next objects to the report and letter as evidence of a subsequent remedial measure. A subsequent remedial measure has to be *subsequent* to the incident in issue. Fed. R. Evid. 407. "When, *after* an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of *subsequent* measures is not admissible to prove . . . culpable conduct. . . ." *Id.* (emphasis added). The report and the letter came prior to Seal's incident. Further, the report and letter are not offered to prove that Payne is liable for violating the 1995 Consent Judgment, nor did the Court rely on them for that purpose. Moreover, a subsequent remedial measure can be used for "another purpose" such as notice. *Id.* The Court relied on these exhibits to show constructive notice.

Payne next argues that these letters are hearsay and "back door" expert opinions. The Court relied on these to show constructive notice, not the truth of the matter. Payne acknowledges that they were submitted to prove constructive notice.

Finally Payne argues they are unfairly prejudicial because they merely give personal opinions. Opinions are not *per se* unfairly prejudicial. He also argues he "probably" cannot cross examine the author of the document. (Payne's 2d Mot. Strike at 17). This is not what is meant by Rule 403 prejudice. Further, he admitted that he in fact received the report and that he was in constant communication with the author of the report while it was being written. Finally there is no reason to suspect that he cannot cross examine the author of the report.

### III. EXHIBIT I

Seal's Exhibit I is excerpts from Rhodes's deposition. Payne argues that her deposition testimony is character evidence to show that Wills and Thompson had a propensity to conspire to abuse inmates. First, Payne does not explain how he has standing to bring such an argument.

Second, Payne argues it is character evidence because "Plaintiff has put forward no evidence that

Rhodes was present or had personal knowledge of any of the events that occurred on September

5 [sic], 2005." *Id.* at 19. She stated that her testimony was based on her experience and her own

personal observations while working at the jail.

IV.     EXHIBITS J AND K

Exhibits J and K are the trial testimony of Moore and Priest in the excessive force

criminal trial *United States v. Teel*, 1:06cr79-LG-JMR.

First, Payne argues that these testimonies are not sworn or authenticated. These exhibits

show that the testimony was sworn, and the Court takes judicial notice of the fact that the

testimony was in fact sworn in open court before the undersigned during the *Teel* trial. Further,

the Court has carefully compared these exhibits to the official trial transcript in *Teel* and finds

that the exhibits are an exact copy of the relevant portions of that trial transcript. Therefore, the

Court takes judicial notice of the fact that the testimony is authentic.

Payne next argues that the trial transcripts are hearsay. The testimony is admissible and

can be submitted in opposition to a motion for summary judgment, although it is not submitted in

a form that would be admissible at trial. *See Celotex*, 477 U.S. at 324 ("We do not mean that the

nonmoving party must produce evidence in a form that would be admissible at trial in order to

avoid summary judgment."); *see also*, *Thomas v. Atoms Energy Corp.*, 223 Fed. Appx. 369, 373

(5th Cir. Mar. 21, 2007) (explaining that otherwise admissible evidence can be submitted in a

form, such as an affidavit, that would not be admitted at trial). Further, Moore and Priest's trial

testimonies are statements against interest. Fed. R. Evid. 804(3). That is to say they were

statements "which was at the time of its making so far contrary to the declarant's pecuniary . . .

interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Id.*

Payne next argues this is character evidence because it is offered to prove that Thompson had a propensity to use excessive force. Once again, Payne does not explain why he has standing to raise this argument. Further, the Court did not rely on these exhibits to prove Thompson used excessive force against Seal.

Payne next argues that the testimony is irrelevant on actual or constructive knowledge, because the testimony and events contained in the testimony came after Seal's alleged beating. The testimony clearly concerns matters that occurred prior to Seal's alleged beating.

Payne also argues the testimony is irrelevant because (1) the prior beatings are not enough to show a pattern of abuse and (2) the testimony is vague. This is in direct contradiction to his argument on character evidence, where he complains that the testimony shows "a propensity to abuse inmates." (Payne's 2d Mot. to Strike at 11). Finally, these arguments go to the weight of the evidence, not the admissibility.

Payne finally argues the testimony is unfairly prejudicial because it will inflame the jury with reference to the Williams incident. Payne is the one who invoked the Williams incident, so this issue is waived. There was no jury, as this was a motion for summary judgment, so the issue is meritless. Finally, the Court did not rely on any testimony about the Williams incident, so the issue is moot.

For the foregoing reasons, the Court denies Payne's second Motion to Strike.

**IT IS THEREFORE ORDERED AND ADJUDGED**, that for the reasons stated above,

Defendant Sheriff George Payne's Motion for Summary Judgment [252] should be and is hereby **GRANTED** on the Section 1983 conspiracy to deny access to courts claim and punitive damages claim. The Section 1985 claims are dismissed without prejudice. The remainder is **DENIED.**

   **IT IS FURTHER ORDERED AND ADJUDGED** that Payne's Motion to Substitute Exhibit [260] should be and is hereby **DENIED**.

   **IT IS FURTHER ORDERED AND ADJUDGED** that Payne's second Motion to Strike [301] should be and is hereby **DENIED.**

   **SO ORDERED AND ADJUDGED** this the 18th day of June, 2010.


                                        s/ *Louis Guirola, Jr.*
                                        LOUIS GUIROLA, JR.
                                        UNITED STATES DISTRICT JUDGE